## Custody of a Minor (No. 1).

Suffolk. February 5, 1979.-April 20, 1979.

Present: Hennessey, C.J., Quirico, Braucher, Kaplan, & Abrams, JJ.

*Jurisdiction,* Care and protection of minor. *Parent and Child,* Care and protection of minor. *Due Process of Law,* Care and protection of minor.

Evidence in a proceeding under G. L. c. 119, § 24, supported a finding that the mother of a newborn child was incapable of caring for him and that the child was in need of care and protection at the time of trial. [880-883]

Upon appeal from a determination under G. L. c. 119, § 24, that a child was in need of care and protection, this court declined to adopt a requirement of "clear and convincing" evidence as to the standard of proof in such actions; however, it required in all cases of child neglect that a judge exercise the utmost care, as demonstrated through specific and detailed findings of fact, in rendering a judgment. [884-886]

CIVIL ACTION commenced in the Municipal Court of the Dorchester District on January 12, 1976.

On appeal the case was heard by *Poitrast,* J., a judge of the Boston Juvenile Court.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review

*Leo M. Lazo* for the defendant.

*E. Michael Sloman,* Assistant Attorney General, for the plaintiff.

*Jinanne S. J. Elder & John Reinstein* for the Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

HENNESSEY, C.J. On January 12, 1976, Elsie Peck, a social worker employed by the Division of Family and

Children's Services of the Department of Public Welfare (department), petitioned the Municipal Court of the Dorchester District, pursuant to G. L. c. 119, § 24, for a determination that the respondent-mother's newly-born son was a child in need of care and protection. After a continuance of two and one-half months, and following a hearing, the judge granted the department's petition and awarded it custody of the child. The mother exercised her right to trial de novo, G. L. c. 119, § 27, see *Robinson* v. *Commonwealth*, 242 Mass. 401 (1922), and her appeal was heard by a judge of the Boston Juvenile Court. Focusing chiefly on the mother's parental fitness as evidenced by her treatment of her other children, the judge entered findings of fact and affirmed the award of custody to the department. The mother appealed to the Appeals Court and we transferred the case to this court on our own motion.

Two arguments are raised on appeal by the child's mother. It is first claimed that the court lacked sufficient basis to justify removal of a child from its natural parent because there were no findings that the welfare of the child was endangered at the time of trial. It is also averred, for the first time ever in this court, that the judge failed to apply the proper standard of proof — "clear and convincing evidence" — in determining the necessity of awarding custody to the department.

We think the judge's findings are more than adequate to support the statutory and constitutional requirements for invading the family unit. We decline to adopt the mother's suggestion that we require "clear and convincing evidence" as the measure of proof in actions where children are removed from their parents. However, we are persuaded that it is constitutionally demanded that a judge exercise the utmost care, as demonstrated through specific and detailed findings of fact, in rendering a judgment which deprives parents of child custody. Although we state this requirement for the first time here, we believe the judge's findings indicate that this

standard has been met. Accordingly, we affirm his custody award.

Since there is no dispute as to their accuracy, we accept the findings of the judge. The child involved in these proceedings was born in Boston on January 9, 1976, to a mother having a substantial history of child neglect. Until 1972, the mother was the caretaker of her own three children, who were born between 1960 and 1963, and of two other children, a niece and nephew of her husband, who joined the family between 1964 and 1968. As early as 1965 there were reports that some of the children in the mother's care had been truant from school. These reports continued intermittently, and in May and June, 1970, it was reported that the children were absent from school as much as 50% of the time.

In March, 1972, following reports of chronic truancy regarding the children and of strong odors of urine emanating from the mother's apartment, the department dispatched a social worker, Jeanne Yozell (Yozell), to visit the mother's apartment on Geneva Avenue in Dorchester. See G. L. c. 119, § 51A. On her arrival Yozell found the mother, her children, and eight dogs in a cold, cluttered apartment.[1] The apartment was without heat, electricity, hot water, or gas. It was littered with dog feces and smelling of urine. The children were ill-clothed and dirty, and had difficulty with bowel and bladder control. Two of the children were found locked in a room. The mother explained that the condition of the apartment was attributable, in part, to her being deeply in debt, with past due obligations for rent and utilities. The reason for the children's truancy, she stated, was her inability to provide them sufficient clothing, coupled with the fact that the children simply did not like school.

As a result of Yozell's visit, the mother voluntarily placed the children with the department until she could get reorganized. In turn, the department found foster

---

[1] By this time, the mother was separated from her husband.

homes for all the children but one, Leroy, who was allowed to return to his mother because he refused to remain in the foster home provided by the department. Shortly after this event, the mother relocated in Jamaica Plain in an apartment subsequently found to be without heat and littered with glass from broken windows. During the next eight months, attempts to provide financial, housing, and medical care counseling to the mother were frustrated by the mother's failure to keep most of her pre-arranged appointments with Yozell.

In November, 1972, Mary Ann Dougherty (Dougherty), was assigned to replace Yozell as the department's contact with the family. By then, the children had all been placed at St. Vincent's Home in Fall River, where it was found that none of the children was toilet trained and all were behind in schooling. Since Leroy was still at home, but not attending school, Dougherty attempted to establish a relationship with the mother. As before, the home was found to be generally messy and without food or utility service. Attempts to work with the mother became futile because the mother was again inconsistent in keeping the necessary appointments. Meanwhile, Leroy was professionally examined and determined to be suffering from academic neglect and in need of psychiatric counseling.

The mother, since 1972, has changed apartments frequently; on at least one occasion she has been evicted for failure to pay rent. In October, 1974, the father of the child at issue moved in with the mother and Leroy. By the time the child was born, on January 9, 1976, however, the father was no longer living with the family.[2] Three days after the child's birth, the department petitioned for custody of the infant. During the pendency of the petition, until the Dorchester District Court granted custody to the department, the child was allowed to remain with

---

[2] The father of the child, as well as the mother's legal husband, have waived any right to custody in this matter.

the mother, but under the supervision of a homemaker and a public health nurse supplied by the department.

On the basis of these facts, the judge concluded that the mother "is a deprived, immature, impulsive, inconsistent, disorganized person whose inadequacies as a parent have deprived her children in the past of even basic physical needs of food, clothing and shelter . . . . [I]f the Court decided to return the infant to [the mother] even temporarily, she would be in need of massive help, including around-the-clock homemaker service, which homemaker would be invested with the primary responsibility for the children." Believing the mother therefore incompetent to provide proper care for the child, the judge ordered him permanently committed to the department.

1. We turn first to the mother's contention that the judge's findings were inadequate to justify granting custody of the child to the department. The mother maintains that under G. L. c. 119, § 24, and the United States Constitution, the judge is required to make a finding of parental unfitness at the time of trial, a finding she asserts is absent from the record, as a prerequisite to an order depriving a parent of custody of his or her child. We agree that such a finding is required, but we think the judge's findings represent an unequivocal determination of current, as well as past, parental incapacity.

That a finding of current parental unfitness is required in a proceeding which results in a parent's loss of child custody derives from the substantial respect we accord family autonomy. The existence of a "private realm of family life which the state cannot enter," *Prince* v. *Massachusetts*, 321 U.S. 158, 166 (1944), is a cardinal precept of our jurisprudence. See *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption*, 376 Mass. 252 (1978); *Custody of a Minor*, 375 Mass. 733 (1978); *Quilloin* v. *Walcott*, 434 U.S. 246 (1978); *Smith* v. *Organization of Foster Families for Equality & Reform*, 431 U.S. 816 (1977); *Griswold* v. *Connecticut*, 381 U.S. 479 (1965);

*Meyer* v. *Nebraska*, 262 U.S. 390 (1923).[3] Yet, rights evolving from one's interest in family integrity are not absolute. *Custody of a Minor, supra. Roe* v. *Wade*, 410 U.S. 113 (1973). Indeed, there can be scarce doubt that the State may properly act to protect children of tender years from parental neglect. *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption, supra* at 265. *Stanley* v. *Illinois*, 405 U.S. 645, 652 (1972). *Alsager* v. *District Court of Polk County*, 406 F. Supp. 10, 16 (S.D. Iowa 1975), aff'd 545 F.2d 1137 (8th Cir. 1976).

The procedure by which this action has been brought, the "care and protection" proceeding, is one legislative response to the problem of child maltreatment.[4] Pursuant to the statutory provision creating the action, G. L. c. 119, § 24, as amended through St. 1975, c. 276, § 3, any person concerned for a child's welfare may file a petition in the appropriate court alleging that the child "is without necessary and proper physical, educational or moral care and discipline, or is growing up under conditions or circumstances damaging to a child's sound character development, or who lacks proper attention of parent, guardian with care and custody, or custodian, and whose parents or guardian are unwilling, incompetent or unavailable to provide such care." If the court finds the allegations proved, the judge may commit the child to the department until the minor becomes eighteen years of age or the judge may make any other order deemed appropriate to the child's best interests. G. L. c. 119, § 26. See Shubow & Stahlin, Juveniles in Court: A Look at a System in Flux, 61 Mass. L.Q. 193, 195 (1977). Significant-

[3] We have recognized the right of natural parents to raise their children as existing independently of the State. *Richards* v. *Forrest*, 278 Mass. 547, 553 (1932). See J. Locke, Second Treatise of Government (London 1690).

[4] See generally S. Katz, When Parents Fail (1971); Wald, State Intervention on Behalf of "Neglected" Children: A Search for Realistic Standards, 27 Stan. L. Rev. 985 (1975); Mnookin, Child-Custody Adjudication: Judicial Functions in the Face of Indeterminacy, 39 L. & Contemp. Prob. 226 (1975).

ly, parents, among others, retain the right to petition the court every six months for review and redetermination of the current needs of the child. G. L. c. 119, § 26.

While there may have been some question in prior years regarding the kinds of evidence sufficient to prove cases, like those under c. 119, where a parent stands to lose custody of a child, see *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 651 (1975) (Hennessey, J., dissenting), it is now clear that the Commonwealth may not attempt to force the breakup of a natural family without an affirmative showing of parental unfitness. *Little Wanderers, supra* at 641-642. *Quilloin* v. *Walcott, supra* at 255. Because the interest of the child is thought to be best served in the stable, continuous environment of his own family, see *Stanley* v. *Illinois, supra* at 651; Goldstein, Freud & Solnit, Beyond the Best Interests of the Child (1973), State intervention in the parent-child relationship is justified only when parents appear unable to provide for their children's care and protection. *Custody of a Minor, supra* at 749; *Roe* v. *Conn*, 417 F. Supp. 769, 779 (M.D. Ala. 1976) (three-judge court); *Alsager* v. *District Court of Polk County, Iowa, supra* at 24; Burt, Developing Constitutional Rights of, in, and for Children, 39 L. & Contemp. Prob. 118, 128 (Summer 1975).[5]

Notwithstanding this measure of deference that must be accorded parental and family rights, the State interest in protecting neglected children may properly be preventive as well as remedial. See *Long* v. *Long*, 255 N.W.2d 140, 143 (Iowa 1977); *Waagen* v. *R.J.B.*, 248 N.W.2d 815, 819 (N.D. 1976). The court need not wait until it is presented with the maltreated child before it decides the

---

[5] Fittingly, it is the stated policy of c. 119 to "provide substitute care of children *only* when the family itself or the resources available to the family are unable to provide the necessary care and protection to insure the rights of any child to sound health and normal physical, mental, spiritual and moral development" (emphasis added). G. L. c. 119, § 1, as amended through St. 1972, c. 785, § 5.

necessity of "care and protection." Rather, an assessment of prognostic evidence derived from an ongoing pattern of parental neglect or misconduct is appropriate in the determination of future fitness and the likelihood of harm to the child. See *In re Terry D.*, 83 Cal. App. 3d 890, 900 (1978); *State* v. *Randall*, 187 Neb. 64 (1971); *In re Fred S.*, 66 Misc. 2d 683 (N.Y. Fam. Ct. 1971). Such evidence, particularly where unrebutted by more recent proof of parental capacity, provides a satisfactory basis for a finding of current parental unfitness.[6]

We therefore think it plain that the judge was warranted in determining the mother's newborn child to be in need of care and protection at the time of trial. The uncontested facts, as reported by the judge, indicate that the mother is incapable of providing the basic necessities of food and shelter, ignorant of proper child care and supervision, see *In re Fred S., supra* at 697, indifferent to her children's education, and apparently unwilling to cooperate with departmental attempts to rearrange her life, see *In re Rosenbloom,* 266 N.W.2d 888 (Minn. 1978). To the extent that these findings refer to the mother's past conduct, it is with the understanding that the problems described therein continue unabated through the present. Not unlike the respondent in a prior case of ours, *Petition of the Dep't of Pub. Welfare to Dispense with Consent to Adoption,* 371 Mass. 651, 654 (1976), the mother here has failed to formulate any realistic plan by which she could care for her two children already in the department's custody. Thus, in these circumstances, court intervention is appropriate in order to protect a child who, although not yet maltreated, is a probable victim of parental neglect. See *J. & E.* v. *M. & F.*, 157 N.J. Super. 478 (1978). See also *Vilakazi* v. *Maxie,* 371 Mass. 406, 409 (1976).

---

[6] We think this result must have been contemplated by the Legislature, if the purpose of the "care and protection" statute—"to insure that the children of the commonwealth are protected against the harmful effects" of parental abuse or neglect—was to be given full effect. G. L. c. 119, § 1. Report of The Subcommittee on Child Welfare Legislation, 1952 House Doc. No. 2440, at 43.

2. Although it is clear that the judge possessed sufficient grounds to find the child in need of care and protection, a further issue is raised, a question of first impression in this court, concerning the appropriate standard of proof for findings that determine that it is in the child's best interest to be removed from his parent. The mother urges, and the department concedes, that, because of the importance placed on the family, a parent-child relationship should be disturbed only on a showing of "clear and convincing" evidence that a need for such intervention exists. While we agree with the premise that custody of a child should be removed from a parent to the State only on most careful judicial consideration, we decline to adopt the "clear and convincing" standard urged here. We think that the objective to be sought can be better accomplished by a requirement of specific findings than by the injection of a standard of proof which is intermediate between the standards ordinarily applied in civil and criminal matters.

Where constitutional rights hang in the balance, a greater level of factual inspection has sometimes been required in civil cases as an additional safeguard against improvident judicial action. See *Superintendent of Worcester State Hosp.* v. *Hagberg*, 374 Mass. 271, 275 (1978); *Andrews, petitioner*, 368 Mass. 468, 488 (1975); *Stone* v. *Essex County Newspapers*, 367 Mass. 849, 870 (1975) (following *Gertz* v. *Robert Welch, Inc.*, 418 U.S. 323, 342 [1974]). Indeed, we believe that important personal rights, such as those involved when the breakup of a family is threatened, warrant an extra measure of evidentiary protection. Cf. *Marcoux* v. *Attorney Gen.*, 375 Mass. 63, 65 n.4 (1978). For some parents, loss of a child may be as onerous a penalty as the deprivation of the parents' freedom. Thus, while it may be observed that a c. 119 custody determination in favor of the department is neither a final nor complete[7] severance of the parent-

---

[7] Even after a parent has been deprived of child custody under c. 119, the parent retains such residual rights as the right to visit,

child relationship, we think that the effect of such an order places a sufficient burden on family integrity to make the determination deserving of added judicial attention. See *Sims* v. *State Dep't of Pub. Welfare of Tex.*, 438 F. Supp. 1179, 1194 (S.D. Tex. 1977) (three-judge court); *Alsager* v. *District Court of Polk County, supra* at 25; *In re William L.*, 477 Pa. 322, 333 (1978); ABA Standards Relating to Abuse and Neglect, § 5.3E(2) (Tent. Draft 1977); Annot., 79 A.L.R.3d 417 (1977).

We think it undesirable, however, to adopt the mother's suggestion that we require "clear and convincing" proof in cases of the kind presented here. "Clear and convincing" evidence standards, as we recently observed in *Superintendent of Worcester State Hosp., supra* at 275-276, often act as the functional equivalent for the more familiar "reasonable doubt" standard. As such, the introduction of this third test of proof may serve no useful purpose and add only confusion. See *Stone, supra* at 877 (Quirico, J., concurring in part and dissenting in part). However, if we were, for the sake of simplicity, to adopt a "reasonable doubt" test in cases involving parental neglect, we fear that we might overly jeopardize the welfare of the child. If proof "to a moral certainty," a requirement of our interpretation of "beyond a reasonable doubt,"[8] were demanded before a judge could find it necessary to remove a child from his or her parents, preventive intervention by a court, as proposed by the department here, might well be precluded.

We prefer to take the position that the personal rights implicated in proceedings of this character require the

---

G. L. c. 119, § 35, to consent to adoption, G. L. c. 210, §§ 2-3, and to determine the child's religious affiliation, G. L. c. 119, § 33. See Campbell, The Neglected Child: His and His Family's Treatment under Massachusetts Law and Practice and their Rights Under the Due Process Clause, 4 Suffolk U.L. Rev. 631, 656-657 (1970).

[8] See *Commonwealth* v. *Seay*, 376 Mass. 735, 745-746 (1978); *Commonwealth* v. *Webster*, 5 Cush. 295, 320 (1850) (Shaw, C.J.).

judge to exercise the utmost care in promulgating custody awards. Such care, in our view, demands that the judge enter specific and detailed findings demonstrating that close attention has been given the evidence and that the necessity of removing the child from his or her parents has been persuasively shown.[9] Moreover, we do not limit this requirement merely to cases where the ultimate outcome involves the loss of custody by a parent. In all cases of child neglect, including those where a disposition depriving a parent of custody is adjudged unnecessary, see *Custody of a Minor*, 375 Mass. 733 (1978), we think it well advised that a judge make specific findings of fact. Cf. *King* v. *King*, 373 Mass. 37 (1977); *Rice* v. *Rice*, 372 Mass. 398 (1977). "[A]s every judge knows, to set down in precise words the facts as he finds them is the best way to avoid carelessness in the discharge of [one's] duty: Often a strong impression that, on the basis of the evidence, the facts are thus-and-so-gives way when it comes to expressing that impression on paper." *United States* v. *Forness*, 125 F.2d 928, 942 (2d Cir.), cert. denied sub nom. *Salamanca* v. *United States*, 316 U.S. 694 (1942) (Frank, J.). See *United States* v. *Merz*, 376 U.S. 192 (1964); *Woods Constr. Co.* v. *Pool Constr. Co.*, 314 F.2d 405 (10th Cir. 1963).[10]

In this case the judge's findings, see *supra*, make it manifest that the utmost care was devoted to the determination of the custody award. Accordingly, we hold that the judge's decision and order are to be affirmed.

*So ordered.*

[9] We are aware that the procedure mandated here constitutes an exception to Rule 52 of the Rules of Procedure for the District Courts and Municipal Court of Boston (1975) under which the submission of written findings of fact is optional at the discretion of the judge. See J.W. Smith & H.B. Zobel, Rules Practice 241 (1977).

[10] While much of what we say here applies to custody disputes involving husbands and wives or other relatives of the child, we wish to make clear that the requirement of detailed findings is directed only to custody controversies between the parent and the State.