## BRENDA A. BEZIO vs. MAGDALENA PATENAUDE.

Franklin. June 9, 1980. — September 22, 1980.

Present: HENNESSEY, C.J., QUIRICO, KAPLAN, WILKINS, LIACOS, & ABRAMS, JJ.

*Guardian*, Of minor. *Parent and Child*, Custody of minor. *Words* "Unfit," "Unsuitable."

Discussion of the standard to be applied where a parent petitions to revoke a guardianship previously entered upon her assent under G. L. c. 201, § 5. [571-577]

Upon a mother's petition to revoke a guardianship previously entered upon her assent under G. L. c. 201, § 5, the standard to be applied was whether the mother was currently fit to further the welfare and best interests of the child. [570-571]

A mother's voluntary assent to a guardianship petition pursuant to G. L. c. 201, § 5, did not constitute a waiver of her natural custodial rights. [575]

In an action by a mother to revoke a guardianship previously entered upon her assent under G. L. c. 201, § 5, the judge's finding that the mother was unsuitable to have custody of her children because of her unwillingness or inability in the past to assume responsibility for their care was insufficient to support his conclusion that custody should remain in the guardian, and his finding that raising the children in a lesbian household would adversely affect the children was without basis in the record. [578-579]

PETITION filed in the Probate Court for the county of Franklin on November 21, 1975.

A complaint seeking removal of a guardian and return of custody of minor children was filed on February 18, 1977, and was heard by *Keedy*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*William C. Newman & Wendy Sibbison* for the plaintiff.
*Geoffrey A. Wilson (James A. Whitbeck, John M. Finn & Peter S. Johnson* with him) for the defendant.

*John H. Henn, Sandra L. Lynch, Stefanie D. Cantor &
John Reinstein,* for the Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.

*John P. Ward, John Rugheimer, Rosalie Davies & Don
Martin,* for the Gay & Lesbian Advocates & Defenders &
another, amici curiae, submitted a brief.

LIACOS, J.  The plaintiff, Brenda King,[1] appeals from a
judgment of the Franklin County Probate and Family
Court denying her petition to remove the defendant,
Magdalena Patenaude, as guardian and to regain custody of
her two natural children.  The plaintiff's application for
direct appellate review to this court was granted.  The judgment below is not supported by adequate findings as to the
fitness of the mother.  We reverse and remand.  We summarize the facts and the proceedings below.

In January, 1971, Brenda King, then age seventeen, was
introduced by a pastor of a local church to Magdalena
Patenaude, then age twenty-six.  At that time Brenda was
experiencing emotional problems, and it was thought that
Magdalena, who had herself experienced similar difficulties
in her early life, might provide friendship and guidance.
They became close friends.

Brenda's first child, a daughter, was born on December
6, 1972.  Between December, 1972, and April, 1974, when
Brenda married James L. Bezio, Brenda entrusted her child
to the care of her friend Magdalena from time to time. After
her marriage, Brenda and her husband and child lived with
Magdalena for approximately three weeks.  Brenda and her
daughter then moved to North Carolina where James Bezio
was stationed in the United States Army.  In North Carolina
Brenda, then pregnant with her second child, began experiencing medical problems related to her pregnancy.
Brenda testified that she was unable to obtain adequate
medical attention in North Carolina due to military bureau-

---

[1] The plaintiff filed her petition in 1977 under her married name, Brenda
A. Bezio.  She has since resumed the use of her maiden name, Brenda
King.

cracy and her lack of personal funds. In August, 1974, still suffering from complications attendant to the second pregnancy, Brenda returned to Greenfield, Massachusetts, and left her daughter with Magdalena. She returned to North Carolina for approximately one month.

When Brenda was seven months pregnant she was hospitalized in Greenfield for pregnancy complications and potentially fatal, deep thrombophlebitis. At Brenda's request, her daughter was placed in Magdalena's care. Brenda underwent surgery for a pulmonary embolus, and the second daughter was delivered prematurely by caesarean section. Magdalena visited Brenda daily at the hospital. When Brenda was released, she and her two daughters went to live with Magdalena. The following day Brenda was readmitted to the hospital, and the two children remained with Magdalena. She again returned to Magdalena's home upon her release and remained there with the children until January, 1975, when she and the children went to stay with her parents.

In April, 1975, Brenda was experiencing physical and emotional distress, and she arranged to leave her children with Magdalena for approximately one month. The younger child remained with Magdalena for an additional month. Shortly thereafter Brenda took both children to North Carolina. In September, 1975, Brenda returned to Massachusetts with her children for a visit. Brenda left the children with Magdalena and returned to North Carolina where she was again hospitalized for what was diagnosed as another attack of thrombophlebitis. In October, 1975, Brenda returned to Massachusetts at Magdalena's request. The younger child had been suffering from an attack of croup, and Magdalena had been experiencing some difficulty in securing medical care as she was not the child's legal guardian. Brenda met with the attending physician, and both women subsequently discussed the possibility of Magdalena's being appointed legal guardian of the children. Magdalena felt that if she were going to continue caring for the children, she should have legal authority to secure medical treatment for them.

On November 21, 1975, Magdalena filed a petition for temporary and permanent guardianship in the Franklin County Probate and Family Court. Brenda assented, and Magdalena was appointed temporary guardian with custody. Soon thereafter problems developed between the two women regarding visitation rights. In February, 1976, temporary custody was returned to Brenda with Magdalena's assent. On May 11, 1976, the Probate Court judge continued temporary custody in the mother for another three months. Later the same day, however, the two women talked, and Brenda became upset and unsure of her ability to care properly for the children. Brenda decided to leave the children with Magdalena. When the probation officer assigned by the court to supervise the children's custody learned of this development, he filed a report with the court. As a result of his report the court returned temporary custody of the children to Magdalena.

In October, 1976, Brenda assented to Magdalena's appointment as permanent guardian with custody. Both women were represented by the same attorney. The judge granted Brenda the right to visit the children at Magdalena's home "at all reasonable times and occasions." At this time Brenda was experiencing extreme financial difficulty, and symptoms of deep thrombophlebitis persisted.[2] Prior to the court's allowance of the permanent guardianship petition, Brenda had written the court a letter stating that she believed Magdalena to be "the only one fully qualified to raise my children in a manner which I myself would do if I could."

After Magdalena's appointment as permanent guardian, difficulties arose over visitation rights. As a result, Brenda and her then husband, James, filed the present petition to

---

[2] Two doctors who had treated Brenda for symptoms of deep thrombophlebitis testified that at the time of the trial she was no longer in any significant danger from this condition. One doctor who had first examined Brenda in March, 1979, testified that his diagnosis of her symptoms was that she was suffering from asthma.

vacate the guardianship in February, 1977.[3] Brenda also filed a motion for visitation rights. The judge ordered that Brenda be allowed to visit her children every other Saturday from 1 P.M. to 4 P.M.

In April, 1977, Brenda's parents filed a petition for guardianship. The judge appointed a guardian ad litem who reported in May, 1977: "Ms. Bezio lives in what she describes as a 'lesbian relationship' with a young woman. At this time she is not seeking custody of her children feeling that her chosen life style could cause problems for the children. Having battled with her own inner conflicts of gender identification for years, she does not wish to in any way influence her children. . . . Of striking concern to Ms. Bezio is the feeling that Mrs. Patnode [*sic*] is depriving her children of their identity and family heritage. . . . Ms. Bezio is anxious for her children to be placed in the custody of their grandparents and feels that her previous conflicts with them have been resolved." Brenda's parents withdrew their petition for guardianship in November, 1977. The judge, in his findings, indicated that the petition filed by Brenda and James in 1977 was not heard on its merits until September, 1979, due to the illness of the probation officer who had rendered a report, and the petitioner's inability to pay her lawyer.

From October, 1976, until June, 1978, the children were in Magdalena's care, and Brenda regularly exercised her visitation rights. However, on July 22, 1978, Brenda took her children for a regularly scheduled visit and failed to return them. From July 22, 1978, to November 2, 1978, the children lived with Brenda in Vermont. Brenda set up a home there and enrolled the children in school. The older daughter's first grade teacher testified that the child made rapid progress in acquiring the educational skills which she lacked at the beginning of the year. The teacher attributed

---

[3] The plaintiff was subsequently divorced from James Bezio and, by amendment, this action was discontinued with reference to him. See note 12, *infra.*

this rapid progress to Brenda's work with the child at home. Brenda's landlady, coincidentally an experienced social worker, testified that Brenda's apartment was cheerful, clean, and decorated with the children's drawings. The landlady described Brenda's relationship with her children as "relaxed" and "well controlled." "The children seemed happy with it." A Vermont Department of Public Health supervisor described Brenda's apartment as "very clean, very neat and very comfortable." She observed "good rapport" between Brenda King and her children, laughter and conversation, "a good strong relationship."

In November, 1978, Brenda was arrested on a Massachusetts warrant for kidnapping and the children were returned to Massachusetts. A Vermont police officer involved in executing the warrant testified that the children said they loved their mother and did not want to go back to Magdalena. After the children were returned to Magdalena, the complaint against Brenda was dismissed.

Brenda returned to Massachusetts and caused a care and protection complaint to be filed in the District Court of Franklin County against Magdalena. In mid-December, 1978, the children were moved to a neutral foster home. The women were granted visitation rights on alternate weeks. A social worker from the Department of Public Welfare testified that she and other social workers found that charges against Magdalena of neglect and sexual abuse of the children were unsubstantiated, and recommended to the court that the children be returned to the guardian's home. The District Court judge so ordered and at the same time denied the mother all visitation rights for three months. The probate judge concluded that the guardian did not sexually abuse the children and that the "allegation was engendered by the bitterness caused by this litigation."

Brenda, disturbed by her inability to see her children, entered the Elizabeth Stone House in Boston. The Stone House is a home for care, treatment and rehabilitation of persons coming out of stressful situations. Brenda resided at the home from March to June, 1979, and since that time has

returned for weekly visits. A psychotherapist to whom Brenda was referred by the Stone House testified that Brenda did not suffer from any mental disease, and that her therapy was for support in dealing with the separation from her children. A psychologist testified that Brenda's mental health was good and that she was a "very capable and competent mother."

In May, 1979, Brenda secured visitation rights with her children through an order of a judge of the District Court of Franklin. Visitation was supervised by a counselor with the New England Learning Center for Women in Transition (NELCWIT) who testified that the children were happy to see their mother. She stated, "I saw an increasing exchange of love displayed in hugs and kisses, a sharing of their past experiences that they would recall and laugh about." Another NELCWIT child care worker who supervised nineteen hours of visits testified that she observed a normal, loving mother-daughter relationship. A child therapist from NELCWIT concurred stating that Brenda "put a lot of effort into making sure each child got an equal share of her attention."

Brenda proposes to have the children live in her apartment with her if she regains custody. The probate judge indicated in his findings that she is "living in an active practicing homosexual relationship with a young teacher." Uncontradicted expert testimony was presented at trial to the effect that a parent's sexual preference per se is irrelevant to a consideration of that parent's ability to provide necessary love, care, and attention to a child. However, the judge concluded that the "environment in which [Brenda] proposes to raise the children, namely, a Lesbian household, creates an element of instability that would adversely [a]ffect the welfare of the children."[4] This factor along with the mother's "unwillingness or inability in the past to assume the responsibility of their care" was part of the basis

---

[4] The judge also indicated in his findings that the early association between Magdalena and Brenda "may have had a homosexual basis."

on which the judge concluded that Magdalena should not be removed as guardian and custodian of the children.[5]

In deciding that the guardian should retain custody, the judge noted that Magdalena "has provided an excellent home and care for these children. She loves the children and they love her. The children love their natural mother and desire to visit with her but they regard the defendant as their real mother. . . . It would cause great trauma with the children to remove them from a home where they are happy and secure and from the custody of one who loves them and has their welfare at heart. Their best interest requires that they remain with the defendant."

The plaintiff claims error on a variety of grounds. We consider only those issues dispositive of this appeal. The plaintiff contends, and we agree, that it is a fundamental principle that "the Commonwealth may not attempt to force the breakup of a natural family without an affirmative showing of parental unfitness." *Custody of a Minor (No. 1)*, 377 Mass. 876, 882 (1979).[6] Relying upon this proposition, the mother argues that the Probate Court judge erred by failing to apply the "fitness of a parent" test and by ignoring the presumption that a child's welfare is ordinarily furthered by being in the care and custody of a natural parent. The mother takes the position that since the custody provision of the guardianship statute, G. L. c. 201, § 5,[7] requires a

---

[5] The judge ordered that the mother be allowed to visit the children two hours each week under supervision.

[6] "That a finding of current parental unfitness is required in a proceeding which results in a parent's loss of child custody derives from the substantial respect we accord family autonomy. The existence of a 'private realm of family life which the state cannot enter,' *Prince* v. *Massachusetts*, 321 U.S. 158, 166 (1944), is a cardinal precept of our jurisprudence" (citations omitted). *Custody of a Minor (No. 1)*, 377 Mass. 876, 880 (1979).

[7] General Laws c. 201, § 5, provides in pertinent part: "The guardian of a minor shall have the custody of his person and the care of his education, except that the parents of the minor, jointly, or the surviving parent shall have such custody and said care unless the court otherwise orders. The probate court may, upon the written consent of the parents or surviving parent, order that the guardian shall have such custody; and may so order

showing of parental unfitness in order to deprive that parent of custody, the same standard of proof should apply where the parent petitions to revoke a guardianship previously entered upon her assent.

The guardian argues that the Probate Court judge correctly applied the "best interests of the children" test in this case. The guardian contends that the mother's voluntary assent to the October, 1978, guardianship petition constituted a waiver of her natural custodial rights; the Probate Court judge, not being called upon to "force the breakup of a natural family," was not required to apply the "unfitness of the parent" test. Thus, the guardian claims where, as here, the guardian has already been appointed and awarded custody, G. L. c. 201, § 5, does not apply. The guardian argues that this case should be governed by the guardian removal provision contained in G. L. c. 201, § 33, which provides in pertinent part: "If a guardian or conservator becomes mentally ill or otherwise incapable of performing his trust or is unsuitable therefor, the probate court, after notice to him and to all persons interested, may remove him."

In order to determine the appropriate standard for deciding the case at bar, it is useful to review other cases decided by this court where a natural parent sought to remove a guardian and regain custody of minor children. In *Duclos* v. *Edwards*, 344 Mass. 544 (1962), a guardian of three minor children appealed from a Probate Court judge's decree removing her as guardian and awarding custody of the children to their natural father. Following marital difficulties, the parents of the Duclos children had the children placed in the Edwards home. Soon after the mother's death which occurred a few years later the father consented to Edwards' appointment as guardian. Approximately nine years after the original placement of the

---

if, upon a hearing and after such notice to the parents or the surviving parent as it may order, it finds such parents, jointly, or the surviving parent, unfit to have such custody; or if it finds one of them unfit therefor and the other files in court his or her written consent to such order."

Duclos children in the Edwards home, the father, then remarried, petitioned to remove Edwards as guardian and to regain custody. The guardian agreed that the father should have custody of the two older children. Only the custody of the youngest child was in issue. The Probate Court judge found that the father was not an unfit person; that he was able to care properly for his three children; and that the welfare of the children warranted removing the guardian "so as to enable the father . . . to have his entire family with him in his new home." *Id.* at 546. This court affirmed the probate judge's decree.

We framed the issue in *Duclos* with reference to the guardian removal provision contained in G. L. c. 201, § 33,[8] stating: "Unsuitability, as that term is used in the statute, is not to be adjudged solely by an examination of the character, capacity, and conduct of the guardian. . . . All factors should be considered and 'adjudged with reference primarily to the welfare of the child.' See *Cassen* v. *Cassen*, 315 Mass. 35, 37 [1943]. This is the paramount consideration. . . . Admittedly, the order of the judge is a distressing one for the [guardian] and perhaps even for the child. Yet it is 'important in the long view that the child should be reared with her own next of kin and in companionship with her own' sisters. *Stinson* v. *Meegan*, 318 Mass. 459, 465 [1945]. This helps to create a normal family relationship which may well prove to be of inestimable future benefit to all of the children." *Duclos* v. *Edwards, supra* at 546.

*Duclos* lends support to the guardian's contention that a case such as the one at bar should be decided with reference to the guardian removal provision contained in G. L. c. 201, § 33. *Duclos* did, as the guardian suggests, interpret the term "unsuitable," as it is used in the guardian removal provision with primary reference to the best interests of the child. However, in the case at bar the plaintiff mother's position is also supported by the *Duclos* case. The judge in *Duclos* did give considerable weight to the importance of

---

[8] See text, *supra* at 571.

the child's being reared in a normal family relationship with her own next of kin. Moreover, any emotional trauma to the child and the guardian resulting from removal of the guardian was considered less significant than the importance of reuniting the natural family. In further support of the plaintiff's position is the judge's explicit finding in *Duclos* that the natural parent was not "unfit." The plaintiff, of course, argues that a finding of parental unfitness is always required in order to deprive a parent of child custody. We conclude that *Duclos* stands for the following proposition: Where a natural parent is fit to further the best interests of the child, the natural bond between that parent and child normally would render an otherwise suitable guardian an "unsuitable" custodian within the meaning of G. L. c. 201, § 33.

In *Wilkins* v. *Wilkins*, 324 Mass. 261 (1949), as in *Duclos*, the guardian of a minor child appealed from a Probate Court judge's decree removing her as guardian and awarding custody of the child to the natural parents. The guardian, who was appointed in March, 1944, was a sister of the child's father. The circumstances surrounding the appointment were that the father, who was engaged in military service abroad, assented in writing, and the mother was found unfit to have custody. In March, 1947, the parents petitioned for removal of the guardian alleging that the husband had always been a fit person and that the wife had now become a fit person. The Probate Court judge found the mother unfit to have custody. The judge did not find the father, considered apart from the mother, unfit to have custody.

The guardian in that case was described by the judge as "a graduate nurse, of great poise and culture . . . , familiar with children, strongly attached to the child, and devoted to her." *Id.* at 263. He further indicated that "[t]he child loves the guardian and her family, and distrusts her parents. The visits of her parents have been infrequent, and have resulted in worrying the child, who lost weight and woke up at night with 'screaming nightmares.'" *Id.*

The judge concluded that if the child were returned to the parents, "the effect of the emotional shock upon her would probably injure her future. The welfare of the child would be served by leaving her where she is." Despite this conclusion the judge ordered the child returned to her parents. This court reversed. *Id.* at 263-264.

We assumed, without deciding, that the parents had a right to revocation of the decree of guardianship unless the facts were such as would warrant an original appointment with custody under G. L. c. 201, § 5. We then explained that "[i]n determining whether parents are unfit, the most important consideration is whether the welfare of the child would be served by custody in them or in a guardian. . . . It has been said that 'unfit' means 'unsuitable, incompetent, or not adapted for a particular use or service'" (citations omitted). *Wilkins, supra* at 262-263. We concluded that the parents, jointly, taken as a couple, were unfit to have custody within the meaning of G. L. c. 201, § 5.

*Wilkins* lends support to the plaintiff's contention that a case such as the one at bar should be decided with reference to the custody provision of the guardian statute contained in G. L. c. 201, § 5. The question of custody in *Wilkins* turned on our decision that the parents, as a couple, were "unfit" to have custody within the meaning of G. L. c. 201, § 5. However, we also indicated that the welfare of the child is the most important consideration in determining whether the parents are fit to care for their child. That the child suffered "screaming nightmares" after visiting her parents bore heavily on our determination whether the natural parents were fit to have custody.

*Wilkins* and *Duclos* suggest that the custody provision of the guardianship statute, G. L. c. 201, § 5, and the guardian removal provision, G. L. c. 201, § 33, are to be read together in an appropriate case. In both cases there were explicit findings regarding the fitness of the parents. Likewise, each case contained findings relative to the suitability of the guardian. More importantly, both cases stand for the proposition that all factors should be con-

sidered with primary reference to the welfare of the child. *Duclos, supra* at 546. *Wilkins, supra* at 262.

In *Duclos,* the balancing of factors resulted in a decision that the importance of the child's being raised with her natural family outweighed any emotional distress the child might suffer from removal of the guardian. In *Wilkins,* on the other hand, the extreme emotional trauma suffered by the child after visits with her parents tipped the balance against reuniting the child with her natural parents. This court, in *Wilkins,* suggested that if returning custody to the natural parents would be seriously detrimental to the welfare of the child, then the parents could be considered to be unfit ("unsuitable, . . . not adapted for a particular use or service," *Wilkins, supra* at 262-263, citing *Richards* v. *Forrest,* 278 Mass. 547, 552 [1932]) within the meaning of G. L. c. 201, § 5. On the other hand, if the parents are fit, then the guardian is to be deemed "unsuitable" within the meaning of G. L. c. 201, § 33. We note that the judge's findings in the case at bar do not suggest that the children suffer severe emotional trauma as a result of visits with their mother. In fact, the judge finds to the contrary: "The children love their natural mother and desire to visit with her . . . ."

*Perkins* v. *Finnegan,* 105 Mass. 501 (1870), and *Malkin* v. *Pine,* 351 Mass. 358 (1966), are also cases involving custody disputes between natural parents and guardians which confirm this view. While neither *Malkin* v. *Pine, supra,* nor *Perkins* v. *Finnegan, supra,* cites any provision of the guardianship statute (G. L. c. 201, § 5, was formerly codified in Gen. Stats. c. 109, § 4 [1860], and G. L. c. 201, § 33, was formerly codified in Gen. Stats. c. 109, § 24 [1860]), both cases highlight the importance of the natural bond between parent and child. We conclude, on the basis of the cases discussed, that the guardian's contention that the mother's voluntary assent to the October, 1978, guardianship petition constituted a waiver of her natural custodial rights is without merit. The appointment of a guardian did not diminish the weight accorded to the natural bond between parent and child.

Our review of other cases where the parents sought to remove their children from the custody of persons who were not legal guardians reveals virtually the same analysis as in the above-cited cases. See, e.g., *Kauch, petitioners*, 358 Mass. 327 (1970); *Stinson v. Meegan*, 318 Mass. 459 (1945), *S.C.* 319 Mass. 682 (1946); *Gordon v. Gordon*, 317 Mass. 471 (1945); *Richards v. Forrest*, 278 Mass. 547 (1932). We believe that it would be inappropriate to draw a distinction between cases where parents make informal arrangements for their children and cases where parents conscientiously utilize the guardianship statute to make legally proper arrangements for their children.[9] In both types of cases the natural bond between parents and children should be accorded great weight. Natural parents should be denied custody only if they are unfit to further the welfare of their children.

To the extent that cases such as the one at bar may be decided with reference to a particular test or standard, we believe that the critical question is whether the natural parents are currently fit to further the welfare and best interests of the child.[10] Neither the "parental fitness" test nor

---

[9] At this point it is useful to note the distinction between parental consent to a guardianship and parental consent to an adoption. When a child is adopted "all rights, duties and other legal consequences of the natural relation of child and parent . . . except as regards marriage, incest or cohabitation, terminate between the child so adopted and his natural parents and kindred." G. L. c. 210, § 6. In contrast, when a guardian is appointed the parent-child relationship remains intact, and the parent is deprived of custody only by consent or if found "unfit to have such custody." G. L. c. 201, § 5. There was no finding of unfitness when the plaintiff voluntarily surrendered custody of her children to the guardian. Whereas the effect of releasing a child for adoption involves a most serious waiver of rights, the Legislature has created a statutory consent form which gives precise and detailed notice. G. L. c. 210, § 2. By comparison, the guardianship petition on which the mother in the case at bar placed her signature contains no such notice of an unconditional surrender. For discussion of the peculiar legislative standards dealing with adoption procedure under G. L. c. 210, §§ 3, 3A, see *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631 (1975).

[10] We need not reach the mother's further argument that the "unfitness" test is constitutionally required here as we have disposed of the issue on

the "best interests of the child" test is properly applied to the exclusion of the other. This is in accord with what we said in *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631 (1975). In that case we indicated that the "best interests of the child" test and the "unfitness of the parent" test "reflect different degrees of emphasis on the same factors, that the tests are not separate and distinct but cognate and connected." *Id.* at 641.

The probate judge below made no finding that the mother was currently unfit to further the welfare of her children. His finding that the mother is "unsuitable to have the custody of the children because of her unwillingness or inability in the past to assume the responsibility of their care" is insufficient to support his conclusion that custody should remain in the guardian. While it is true that "an assessment of prognostic evidence derived from an ongoing pattern of parental neglect or misconduct is appropriate in the determination of future fitness and the likelihood of harm to the child" (*Custody of a Minor (No. 1)*, 377 Mass. 876, 883 [1979]), the critical inquiry is "current parental [fitness]" (*id.*). Mere failure to exercise custodial rights in the past, particularly where a parent has voluntarily relinquished custody "for appropriate reasons" (*Little Wanderers, supra* at 640), does not support a conclusion that such parent is unfit to further the welfare of the child. In *Duclos* v. *Edwards, supra,* a parent who relinquished custody to a guardian for approximately ten years for reasons no more compelling than those asserted by the mother in the case at bar[11] was not found to be unfit. See *Perkins* v. *Finnegan,*

---

the basis of our case law. "'[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.'" *Globe Newspaper Co.* v. *Superior Court,* 379 Mass. 846, 854 (1980), appeal filed 48 U.S.L.W. 3786 (No. 79-1862 May 23, 1980), quoting from *Fazio* v. *Fazio,* 375 Mass. 394, 405 (1978).

[11] The judge found that "[b]ecause of ill health and mental and emotional problems, the plaintiff has been unable to cope with the problem of

*supra* (parent who relinquished custody to a guardian for approximately six years not found unfit); *Malkin v. Pine, supra* (parent who relinquished custody to guardians for approximately two years not found unfit). See also *Kauch petitioners, supra; Stinson v. Meegan, supra; Gordon v. Gordon, supra; Richards v. Forrest, supra.*

The judge's finding that "[t]he environment in which [the mother] proposes to raise the children, namely, a Lesbian household, creates an element of instability that would adversely affect the welfare of the children" is also insufficient to support the judge's conclusion that custody should remain in the guardian. Our reading of the record does not support an inference that the mother's lesbianism would render her unfit to further her children's welfare. Both parties introduced evidence to the effect that a mother's sexual preference per se is irrelevant to a consideration of her parental skills. Dr. Alexandra Kaplan, a clinical psychologist and professor of psychology at the University of Massachusetts, testified as follows: "[T]here is no evidence at all that sexual preference of adults in the home has any detrimental impact on children. . . . [M]any other issues influence child rearing. Sexual preference per se is typically not one of them. . . ." Defendant's counsel questioned further: "[T]here is nothing to prove that a homosexual relationship would make or in any way influence a child to be a homosexual rather than a heterosexual?" Dr. Kaplan responded: "Quite [to] the contrary. . . . [M]ost children raised in a homosexual situation become heterosexual as adults. . . . There is no evidence that children who are raised with a loving couple of the same sex are any more disturbed, unhealthy, maladjusted than children raised with a loving couple of mixed sex. [Sexual orientation of the parent] is irrelevant to [the child's] mental health." Psychologist David Johnson, a defense witness who had seen

caring for her two children. Because her parents disapprove of her life style, she early turned to the defendant for support in the caring and rearing of her two children."

the children in play therapy, concurred with Dr. Kaplan's opinion that homosexuality per se is irrelevant to parental ability.

A finding that a parent is unfit to further the welfare of the child must be predicated upon parental behavior which adversely affects the child. The State may not deprive parents of custody of their children "simply because their households fail to meet the ideals approved by the community . . . [or] simply because the parents embrace ideologies or pursue life-styles at odds with the average." *Custody of a Minor (No. 2)*, 378 Mass. 712, 719 (1979). See *M.P.* v. *S.P.*, 169 N.J. Super. 425 (1979). In the total absence of evidence suggesting a correlation between the mother's homosexuality and her fitness as a parent, we believe the judge's finding that a lesbian household would adversely affect the children to be without basis in the record. This is not a matter about which the judge could take judicial notice. "Matters are judicially noticed only when they are indisputably true. . . . Judicial notice is not to be extended to personal observations of the judge . . . ." *Nantucket* v. *Beinecke*, 379 Mass. 345, 352 (1979). See W.B. Leach & P.J. Liacos, Massachusetts Evidence 27, 34-39 (4th ed. 1967), and cases cited therein.

The only finding on the issue of current parental fitness is the judge's finding that, "[a]lthough the plaintiff's psychological and emotional condition has improved, the elements of instability that have plagued the plaintiff's relationship with her children are still present." Whether the mother is currently fit to advance the best interests of her children is a question that should be resolved on remand by the Probate Court judge. His opportunity to observe the parties first hand is entitled to great weight. Moreover, nearly a year has passed since the trial below, and new evidence may be required to determine the issues. See *Stinson* v. *Meegan*, 318 Mass. 459, 466 (1945).

Accordingly, the judgment is reversed and remanded for further proceedings consistent with the opinion expressed herein.[12]

*So ordered.*

---

[12] The record does not indicate whether or not James Bezio assented to his removal as a party in this action. He is entitled to notice and an opportunity to be heard before he is denied custody of his natural daughter. See *Stanley* v. *Illinois*, 405 U.S. 645 (1972). Cf. G. L. c. 201, § 2; *Barry* v. *Sparks*, 306 Mass. 80, 84 (1940).