## Guardianship of Clyde.[1]

No. 97-P-2250.

Suffolk. March 18, 1998. - May 14, 1998.

Present: Flannery, Gillerman, & Dreben, JJ.

*Parent and Child,* Custody of minor. *Minor,* Custody. *Evidence,* Child custody proceeding. *Practice, Civil,* Guardianship proceeding, Findings by judge.

In a guardianship proceeding brought by the maternal grandparents of a child, the probate judge properly considered the child's best interests when determining the father's parental fitness, the judge's findings were supported by the evidence, and his conclusion that the child would not suffer harm or trauma by the transfer of his physical custody from the grandparents to the father was not clearly erroneous. [773-775]

Petition filed in the Suffolk Division of the Probate and Family Court Department on December 20, 1993.

The case was heard by *Nancy M. Gould,* J.

*Robert W. Carpenter* for the grandparents.

*Marjorie E. Lanier* for the father.

Flannery, J. The maternal grandparents appeal from a decree of the Probate and Family Court discharging their petition for the guardianship of their minor grandson, Clyde, and awarding the biological father sole legal and physical custody of his son. They contend that (1) the judge erroneously applied the standard to determine parental fitness; and (2) the judge's findings are clearly erroneous and not supported by the evidence. We affirm.[2]

1. *Background.* We summarize the findings of the Probate

---

[1] A pseudonym.

[2] On January 21, 1998, the father moved to strike non-record documents from the maternal grandparents' record appendix and to strike all references thereto in their brief. On March 10, 1998, the father moved to strike the maternal grandparents' supplemental appendix and to strike all references thereto in their reply brief. These motions are denied.

and Family Court judge.[3] On May 25, 1990, Clyde's mother and father were married in Ayer. Clyde, the only child of the marriage, was born on May 20, 1991. The mother and the father last lived together as husband and wife in the Dorchester section of Boston on November 24, 1993.

On November 30, 1993, the mother filed a complaint for divorce. On that same date, the mother also filed an ex parte emergency motion for temporary custody of Clyde. In an affidavit accompanying her motion, the mother alleged that, on November 24, 1993, the father brought Clyde to his paternal grandparents' home in New York for what was to be a one-week visit. The mother claimed that, after arriving in New York, the father informed her that he would not be returning Clyde to Massachusetts. The mother further stated that, based on her husband's actions, she believed that he planned to relocate to New York and lied to her in order to take Clyde with him. She alleged that the father had a history of drug use and had criminal charges pending against him; consequently, she claimed that her child's health, safety, and well-being were in danger. The mother requested that the father not be given notice of her motion because she feared that he would flee New York with Clyde. On November 30, 1993, the judge allowed the mother's motion for temporary custody.

On October 20, 1994, the father filed an affidavit in which he alleged that, with the mother's consent, he took Clyde to his paternal grandparents' home in New York, and that in December, 1993, he arranged to meet the mother in Utica, New York, to arrange temporary visits with Clyde in Massachusetts. According to the father, the mother grabbed Clyde and rushed to her car without speaking to the father. The father stated that the mother later informed him that there had been private detectives and sheriff's deputies stationed in the parking lot. Moreover, the father stated that she told him she had legal papers indicating that she had sole custody of their son. The father claimed that he had never been notified of these papers.

On December 20, 1993, the maternal grandparents filed, and a judge allowed, a temporary petition for guardianship of Clyde.[4]

---

[3]Clyde's biological mother is not a party to this appeal. Accordingly, we focus on the findings related to the father.

[4]The trial judge's findings refer to an affidavit submitted by the maternal grandparents with their guardianship petition. We have not found the affidavit

The father responded to the guardianship proceeding on October 20, 1994, seeking temporary custody of Clyde pending resolution of the divorce action. The trial judge found that the ten-month delay was due to outstanding criminal default warrants against the father in Massachusetts. The father retained counsel in Massachusetts, as soon as he was financially able, to represent him in the criminal matters, all of which were later dismissed.

In his affidavit filed with the court on October 20, 1994, the father stated that his parents had been in contact with the maternal grandparents. He stated that in May, 1994, the maternal grandparents cut off all communication between him and Clyde. The father stated that, prior to this time, he had had a wonderful relationship with his son. Moreover, the father noted that since his return to New York, he had obtained a job and had become financially able to retain an attorney to represent him in this matter and other matters pending in Massachusetts. He maintained that his attorney had discovered the ex parte orders, and that he was now able to challenge the unfounded allegations contained in the motions and supporting affidavits.

On December 8, 1994, a temporary order was issued after a hearing on the expiration of the maternal grandparents' temporary guardianship and the father's first attempt to gain custody of Clyde. The order provided for the appointment of a guardian ad litem, Dr. Claire Weiss, to evaluate parental fitness and Clyde's best interests and to determine where Clyde should be placed. The following visitation rights were also ordered: (1) visitation by agreement between either parent and the maternal grandparents; (2) visitation worked out by the child's therapist, the guardian ad litem, and either parent; (3) visitation by further

---

in the appellate record. We have, however, found excerpts from the affidavit in the report of the guardian ad litem, David Goldman. The trial judge found that the maternal grandparents' affidavit did not refer to the father, either as to his whereabouts or to his parental fitness. Rather, it detailed the mother's unfitness to parent Clyde. Namely, it stated that the mother was using drugs, had recently been fired from her job, came home late, did not properly parent Clyde, stole their money to purchase drugs, and frequently left the house between 2 and 3 A.M. and returned two to three hours later.

court order after completion of the evaluation.[5] On October 6, 1995, Dr. Weiss filed her report.[6]

On the ground of the irretrievable breakdown of the marriage, a Probate Court judge issued a judgment of divorce nisi, which became final on February 15, 1996. The provision concerning Clyde in the agreement between the parties, also dated February 15, 1996, was merged into the judgment and retains no independent legal significance. In relevant part the agreement provided: "The issues of custody, child support and visitation are specifically not addressed in the [a]greement because the minor child is presently under a temporary guardianship of the maternal grandparents . . . ."

Also on February 15, the maternal grandparents, father, and mother entered into a stipulation by which the parties agreed that the father would complete psychiatric, psychological, and substance abuse evaluations which would then be forwarded to Dr. Weiss. The parties also agreed that visits between Clyde and his father would be supervised by a designated visitation therapist separate and distinct from Clyde's individual therapist. Then, after a series of consecutive visits, the structure of the visits could be reassessed. The visits were expected to occur only in Massachusetts. The first visit occurred in May, 1996.[7]

On October 16, 1996, David Goldman was appointed successor guardian ad litem. On December 20, 1996, the father's motion for unsupervised visitation in Plymouth was allowed. In his motion, the father stated that he had been enjoying unsupervised visits with Clyde since May, 1996, but that since the pretrial hearing of October 16, 1996, the maternal grandparents had refused such visitation.

---

[5]The trial judge found that the father was not allowed visitation between the time of the appointment of Dr. Weiss as guardian ad litem and the time Dr. Weiss filed her report.

[6]The trial judge determined that Dr. Weiss's report was useful for historical data but was "absolutely worthless for its conclusions." Dr. Weiss recommended visitation between Clyde and his father pending psychiatric clearance and complete psychiatric, psychological, and substance abuse evaluations of the father. Moreover, Dr. Weiss suggested that the father only have supervised visits with Clyde in Massachusetts.

[7]The trial judge found that in May, 1996, she had allowed visitation between the father and Clyde for the first time since the litigation began in December, 1993. The docket entries for the Probate and Family Court do not refer to such an order. However, the report of David Goldman, guardian ad litem, stated that the father's first visit, in accordance with the stipulation, occurred in May, 1996.

On May 20, 1997, Mr. Goldman submitted his report to the court recommending that the maternal grandparents' petition for guardianship be dismissed and that legal and physical custody of Clyde be granted to the father.

On June 30, 1997, after trial, the judge issued a decree discharging the maternal grandparents' petition and granting legal custody to the father, with the maternal grandparents retaining physical custody until further order of the court. The judge ordered a phased transition period for the transfer of physical custody from the grandparents to the father to minimize any trauma to Clyde. To promote the transition, the judge scheduled visitation in New York from June 30, 1997, through July 12, 1997, and from August 23, 1997, through August 30, 1997. The maternal grandparents appealed from this decree on July 24, 1997.

On August 8, 1997, in response to Mr. Goldman's motion, an amended decree was issued ordering that Clyde continue in therapy with Dr. Corbett, the therapist he had been seeing.

On September 25, 1997, the trial judge issued an amended decree, setting December 14, 1997, as the date the father would assume full physical custody of Clyde.[8] The maternal grandparents filed a further notice of appeal from this decree.

On October 27, 1997, the judge denied the maternal grandparents' motion to stay the September 25, 1997, decree. On, December 2, 1997, the maternal grandparents filed a motion to stay the custody transfer order with this court, pursuant to Mass.R.A.P. 6(a), as amended, 378 Mass. 930 (1979). On December 12, 1997, a single justice of this court stayed so much of the trial judge's order that required the transfer of Clyde to the physical custody of his father. The single justice's order stated that the trial judge "must independently reconcile the disparity in the evidence and determine whether or not the child will suffer severe emotional trauma at this time."[9]

On January 5, 1998, in accordance with the order of the single justice, the trial judge issued supplemental findings of

---

[8]The trial judge issued "findings of fact, rulings of law, and a rationale of judgment" on December 5, 1997.

[9]The disparity concerned a letter written by Dr. Corbett and offered by the maternal grandparents after the close of trial. See note 11, *infra.*

fact and conclusions of law.[10]

2. *Discussion.* "The resolution of any custody dispute involving a natural parent necessarily begins with the premise that parents have a natural right to the custody of their children." *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. 573, 587 (1981), and cases cited. The presumption at common law was that "a child's welfare is best served in the care and custody of [his] parents. 'The rights to conceive and to raise one's children' are 'essential . . . basic civil rights of man . . . far more precious . . . than property rights. . . . The interest of parents in their relationship with their children has been deemed fundamental, and is constitutionally protected.' " *Ibid.*, quoting from *Department of Pub. Welfare v. J.K.B.*, 379 Mass. 1, 3 (1979).

The right of parents to be free from State intrusion in child-rearing matters, however, is not absolute. *Petition of the Dept. of Pub. Welfare, supra.* "The State as parens patriae may act to protect minor children from serious physical or emotional harm. In some instances this may require a partial or complete severance of the parent-child relationship." *Id.* at 587-588. The primary focus of courts in such matters is the welfare of the child. *Id.* at 588. " 'To that governing principle every other public and private consideration must yield.' [W]here a child's well-being is placed in issue, 'it is not the rights of parents that are chiefly to be considered.' Although '[p]arents are the biological guardians of their minor child and entitled to its custody . . . [t]heir right will not be enforced to the detriment of the child' " (citations omitted). *Ibid.*

The critical question in cases such as this one, where a biological parent seeks to remove his child from the custody of legal guardians, is "whether the natural parent[] [is] currently fit to further the welfare and best interests of the child." *Bezio v. Patenaude*, 381 Mass. 563, 576 (1980). See *Care and Protec-*

---

[10]The father filed a petition pursuant to G. L. c. 211, § 3, with the Supreme Judicial Court, seeking to vacate the stay allowed by the single justice of this court. On February 3, 1998, a single justice of the Supreme Judicial Court vacated the stay and remanded the case to the trial judge to enter new orders effecting an expeditious transfer of physical custody to the father.

In accordance with the decision of the single justice of the Supreme Judicial Court, the trial judge issued a revised order, dated February 10, 1998. That order provided that physical custody be transferred to the father on February 21, 1998, at noon.

*tion of Bruce, ante* 758 (1998). In the context of a guardianship proceeding, "[e]vidence that is at least 'clear and convincing' is constitutionally required for a finding of parental unfitness." *Custody of a Minor*, 389 Mass. 755, 765-766 (1983). See *Adoption of Katharine*, 42 Mass. App. Ct. 25, 27 (1997) ("[i]n recognition of the constitutionally protected interest of parents in maintaining the natural bond with their children, a judge must find by clear and convincing evidence that a parent is currently unfit to further the child's best interests" when irrevocably removing children from their biological parents). In making this determination, "[n]either the 'parental fitness' test nor the 'best interests of the child' test [can be] applied to the exclusion of the other." *Bezio* v. *Patenaude, supra* at 576-577. Both tests "reflect different degrees of emphasis on the same factors" and, therefore, "are not separate and distinct but cognate and connected." *Id.* at 577, quoting from *Petition of the New England Home for Little Wanderers to Dispense with Consent to Adoption*, 367 Mass. 631, 641 (1975).

The maternal grandparents argue that the trial judge erred in not considering the "best interests of the child" standard when determining parental fitness. The term "fitness" represents more than a test by which the limits of acceptable parental conduct are measured. See *Petition of the Dept. of Pub. Welfare to Dispense with Consent to Adoption*, 383 Mass. at 589. "The term is a standard by which we measure the circumstances within the family as they affect the child's welfare." *Ibid.* Therefore, "if returning custody to the natural parents would be seriously detrimental to the welfare of the child, then the parents could be considered to be unfit." *Id.* at 590.

In *Bezio*, the Supreme Judicial Court recognized that the balancing of factors in these cases is fact specific and often leads to differing results. The court noted, for instance, that in *Duclos* v. *Edwards*, 344 Mass. 544 (1962), "the balancing of factors resulted in a decision that the importance of the child's being raised with her natural family outweighed any emotional distress the child might suffer from removal of the guardian. In *Wilkins* v. [*Wilkins*, 324 Mass. 261 (1949)], on the other hand, the extreme emotional trauma suffered by the child after visits with her parents tipped the balance against reuniting the child with her natural parents." *Bezio* v. *Patenaude*, 381 Mass. at 575.

The trial judge properly considered Clyde's best interests

when determining parental fitness in the original and supplemental findings of fact and rulings of law. The thorough findings commended the maternal grandparents for "being there" for Clyde when his parents were experiencing alcohol and substance abuse problems and recognized that the custody transition would include significant adjustments for all parties. However, the judge specifically found that it would now be in Clyde's best interests to be in the custody and care of his biological father. The judge, familiar with the testimony and credibility of witnesses, concluded that there was no showing that Clyde would suffer harm or trauma by transferring to his father.[11]

Unless the judge's findings are shown to be clearly erroneous, they prevail. *Adoption of Mary*, 414 Mass. 705, 710 (1993). "A finding is clearly erroneous when there is no evidence to support it, or when, 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *Custody of Eleanor*, 414 Mass. 795, 799 (1993) (citation omitted).

The maternal grandparents argue that many of the judge's findings are clearly erroneous and are not supported by the evidence. For instance, they contend that (1) the father had not had regular visits or unsupervised weekend visits with Clyde since March, 1996; (2) the father had not actively sought custody from December, 1993; (3) they had neither vigorously opposed the father's efforts to have regular visits nor had they permitted visits only when ordered to do so; (4) there was no testimony that Clyde ran into his father's arms; (5) there was no testimony that the father had telephoned Clyde at least once a week since 1996; (6) they did not allow Clyde to watch R-rated movies; (7) they were not having marital or sexual problems; (8) they did not return cards the father had sent to Clyde; (9) they did not delay litigation; (10) the father had proper notice of the guardianship petition; and (11) the guardian ad litem did not testify at a September 24, 1997, hearing.

---

[11]The maternal grandparents tendered a letter by Dr. Corbett, Clyde's psychologist, at the hearing on their motion to stay. The judge would not admit the letter into evidence because the trial had concluded. The letter stated that Clyde views his maternal grandparents as his primary family and that placement based upon biological preference would not be in Clyde's best interests. The judge found that Dr. Corbett's letter contradicted his trial testimony and deemed it "unconscionable," as an ex parte communication to the trial judge.

"We do not sit as a trial court to review de novo the evidence presented by the parties." *Adoption of Paula*, 420 Mass. 716, 730 (1995). After reviewing the evidence, we conclude that the findings, although disputed at trial, are supported by the evidence.[12] We are satisfied, after giving due deference to the judge's assessment of the credibility of the witnesses and the weight of the evidence, that the findings, taken together, establish the father's current fitness to further the best interests of Clyde. See *Custody of Eleanor*, 414 Mass. at 799 (on appellate review, "the judge's assessment of the weight of the evidence and the credibility of the witnesses is entitled to deference."). Accordingly, we affirm the decision of the Probate and Family Court.

*Decree affirmed.*

---

[12]Moreover, even if the maternal grandparents identify some erroneous findings, these errors are harmless and do not affect the judge's conclusion that the father is currently fit and able to provide the care that would be in Clyde's best interests.