Gardner, J.
The issue on this appeal is whether a shopping center’s imposition on its tenants of a separate property management fee as an operating expense constituted a breach of the parties’ commercial lease and a violation of G.Lc. 93A, §11. The trial court found that the management fee was not only excessive, at five (5%) percent of gross rents, but also redundant because it was assessed in addition to a fifteen (15%) percent fee for the owner’s administrative costs. Concluding that both the amount and the imposition of the management fee were proper, we reverse the judgment of the trial court
The record indicates the following: Richard’s Diamonds, Inc. (“Richard’s”) and Choice Health, Douglas Investment Group, Inc. (“Choice Health”),[2] leased, in 1990 and 1991, respectively, commercial space in The Westfield Shops, a shopping center in Westfield, Massachusetts. Both leases, entered into with the defendants’ predecessor in title, Wesshops Trust (‘Wesshops”), provided for three five-year renewal options.
In 1994, the Westfield tenants, including Choice Health, executed a lease amendment with Wesshops that required them to pay a portion of the shopping center’s operating costs. That amendment, Section 7.01 (a) of the lease, provided:
In each Lease Year, Tenant will pay to Landlord in addition to the rentals specified in Article II hereof, as further additional rent, subject to the limitation hereinafter set forth, a proportion of the Shopping Center’s operation cost, based on the portion of the year that Tenant occupies space, based upon the ratio of the square feet of the Leased Premises to the total square feet of all the building space in the Shopping Center exclusive of the basement
Section 7.01(b) defines “Shopping Center operating cost,” and imposes a fifteen (15%) percent fee on the total operating cost as payment of Wesshops’ administrative expenses. It states:
For the purpose of the Section 7.01 the ‘Shopping Center’s operating cosf means the total cost and expense incurred in operating and maintaining the common facilities, hereinafter defined, actually used or available for use by Tenant and the employees, agents, servants, customers and other invitees of the Tenant, excluding only items of expense commonly known and designated as carrying charges, but specifically including, without limitation, gardening and landscaping, roof repair, the cost of public liability and property damage insurance, repairs, line painting, lighting, sanitary control, removal *137 of snow, trash, rubbish, garbage and other refuse, depreciation on machinery and equipment used in such maintenance, the cost of personnel to implement such services, to direct parking, and to police the common facilities, and fifteen (15.0%) percent of all of the foregoing toward payment of Landlord’s administrative and overhead cost (emphasis added).
From 1990 to 1997, Wesshops collected from its tenants only its operating expenses, fifteen (15%) percent of those costs as an administrative fee, and base rent Starting in 1997, however, it began to assess an additional fee for management of the facilities. Choice Health paid its pro rata share of the management fees without complaint in 1997 and 1998.
In May, 1999, Wesshops sold the shopping center to Westfield Shops Associates. Westfield Shops Associates is comprised of three duly organized Connecticut limited liability companies: defendants Devcon Westfield, LLC, Brahm Associates, LLC, and Brahm Associates II, LLC (collectively, the “Owner”). These three companies are owned and controlled by the LeBonte family, consisting of three brothers and their father.[3] The day after purchasing the shopping center, the Owner contracted with Devcon Enterprises, Inc. (“DEI”), a property management company, to “manage, operate, lease and maintain the shopping center.” The LeBonte family also owns and controls DEI.
From 1999 to 2003, DEI assessed a management fee of five (5%) percent of the tenants’ gross rents. The Owner, in turn, passed this fee along to its tenants as an operating expense under §7.01 of the lease. As a result, from 1999 to 2003, in addition to its base rent, the Owner collected the shopping center’s operating costs, now inclusive of the five percent management fee, as well as fifteen percent of that subtotal. Despite the marked increase, Choice Health paid without protest.
In December 2003, however, Richard’s and Choice Health filed suit against the Owner and DEI for breach of contract and G.L.c. 93A unfair and deceptive acts arising out of the Owner’s billing scheme. After a bench trial, the judge found that the management fee was both unreasonable and excessive, and held the defendants liable on both complaint counts. Damages were awarded to Richard’s in the sum of $11,592.62[4] and to Choice Health in the sum of $8,766.00. This Dist./Mun. Cts. R. A. D. A., Rule 8C, appeal by the defendants followed.[5]
1. Both the interpretation of a written contract, see Allstate Ins. Co. v. Bearce, 412 Mass. 442, 446-447 (1992), and the existence of any ambiguity in that contract, see Jefferson Ins. Co. of N. Y. v. City of Holyoke, 23 Mass. App. Ct. 472, 475 n.4 (1987), are questions of law for a trial court There was no error in the judge’s ruling of law in this case that the unambiguous language of §7.01 of the parties’ lease permitted the imposition of a management fee by the defendants. Section 7.01(b) states explicitly: “[Tjhe ‘Shopping Center operating cost means the total cost and expense incurred in operating and maintaining the common area facilities ... specifically including ... the cost of personnel to implement such services....” The “cost of personnel” to operate the common area facilities, or a management fee, plainly constituted a common area expense under §7.01 (b).
2. Despite his ruling that the parties’ lease permitted a management fee, the trial judge determined that the particular fee charged in the circumstances of this case constituted a breach of contract by the defendants. Choice Health’s breach of contract claim presented an issue of fact for the trial court, Dowse, Inc. v. Brockunier, 1992 Mass. App. *138 Div. 44, 47, citing Bedford Heating & Air Conditioning Co. v. Milano, 6 Mass. App. Ct. 898 (1978), and the judge’s findings of fact on that issue must stand unless they are “clearly erroneous.” Mass. R. Civ. P., Rule 52(a). See also Demoulas v. Demoulas Super Markets, Inc., 424 Mass. 501, 509 (1997). A finding is clearly erroneous when it is unsupported by the evidence adduced at trial, Guardianship of Clyde, 44 Mass. App. Ct. 767, 774 (1998), or when, despite the existence of supporting proof, “the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” Demoulas, supra, quoting United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948). See also J.A. Sullivan Corp. v. Commonwealth, 397 Mass. 789, 792 (1986). We conclude that the evidence did not permit a finding of a breach of contract in this case.
The judge found that the management fee was improperly duplicative because it constituted a charge for services that the defendants were already obligated to provide to their tenants; and that the defendants’ corporate principals had created DEI for the express purpose of collecting this management fee in addition to the administrative fee the defendants were charging.[6] The record in this case indicates, however, that although owned and controlled by the same individuals as the corporate defendants, DEI had been in operation for more than decade, and operated independently with a 25-person staff responsible for the management of eight commercial properties and four residential properties in four states. Further, unlike the Recoil situation, the evidence established that DEI actually managed and maintained the property and that the tenants, including Choice Health, were provided with actual goods and services for their management fee. Indeed, the trial judge found that DEI “did manage the property and was available to the tenants when repairs were required, nor is it in dispute that the property was well maintained during the period in question.” The judge also noted that Choice Health had paid, without protest, a separate management fee for the services later provided by DEI to the defendants’ predecessor for years.
Nor is there any basis in the record for the court’s finding that a management fee of five (5%) percent of gross rents was excessive or unconscionable. The trial evidence indicated that the rent percentage charged was the industry standard among properly management companies.
3. Choice Health offered no evidence to substantiate its G.L.c. 93A claim beyond that advanced in support of its unsuccessful breach of contract claim. Thus, a finding should have been entered for the defendants on the G.L.c. 93A claim as well. See Crean v. Stoughton Motor Mart, Inc., 2005 Mass. App. Div. 130, 132.
Accordingly, the judgment for plaintiff Choice Health is vacated, and judgment is to be entered for the defendants.
So ordered.

 The plaintiffs’ actions were consolidated for trial. Richard’s Diamonds, Inc. is not named as a party to this appeal, however.

 The trial judge noted that there was conflicting evidence presented as to what brother controlled which corporation and as to what role the father played in each.

 The trial judge doubled the damages awarded to Richard’s Diamonds, Inc. under G.L.c. 93A, §9 (3). The judge did not multiply Choice Health’s award.

 Although the defendants Med to file their Dist/Mun. Cts. R. A. D. A., Rule 8C(b) “appeal on the record of proceedings” within thirty days of their notice of appeal, we granted the defendants’ Rule 14(b) motion for additional time based on good cause shown. Choice Health, Douglas Inn Grp., Inc. v. Devcon Enters., Inc., 2006 Mass. App. Div. 93.

 The judge relied heavily on the findings and rulings of a superior court trial judge in Recoll Mgt. Corp. v. Stone & Webster Engineering Corp., no. 964225A (Dec. 30, 1999), which was largely inapposite. The landlord in that case used a triangular billing system to create “markups” that resulted in double charges to the tenant for building maintenance services. The Recoil trial judge found that “[t]he markups did not embody actual outlays; and they did not bring useful goods or services to Recoil.... The markup had the character of an arbitrary profit margin, and not the character of the recovery of a useful expenditure.... The markups did not purchase any real-world or marketplace goods and services; they functioned simply as accounting-world conventions between affiliated entities operating at less than arm’s length. Consequently, they provided no incremental benefits to Recoil. Recoil received the same unchanging quantity and quality of cleaning, maintenance, and security work from the building staff with or without the markups.” Id. at 10.