Coven, J.
The defendants, Marc and Patricia Frey (the “Freys”), contracted with the plaintiff, John Falat (“Falat”), for his architectural design services in the renovation of their residence. Under the terms of the parties’ written agreement, Falat was to be paid twelve (12%) percent of the projected $412,000.00 construction cost based on an earnings schedule that compensated Falat at five stages of the renovation project.[2] The agreement also entitled Falat to compensation “[i]n the event of termination not the fault of [Falat]” in accordance with another earnings formula.[3] The Freys terminated Falafis services, and Falat commenced this action against the Freys to recover $16,000.00.[4]
Falat argues on appeal that the trial judge erred in finding that Falat “effectively chose to terminate the contractual relationship with” the Freys by his “conduct during [a] telephone call with Patricia Frey,” which the trial judge characterized as “unprofessional” behavior. In reviewing a nonjury case, we accept the trial judge’s findings of fact unless they are clearly erroneous. “A finding is clearly erroneous when there is no evidence to support it, or when, although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.” Guardianship of Clyde, 44 Mass. App. Ct. 767, 774 (1998), quoting Custody of Eleanor, 414 Mass. 795, 799 (1993). “If the trial judge makes one of several possible choices of what facts are *152 supported by the evidence, the judge’s choice is not clearly erroneous.” W. Oliver Tripp Co. v. American Hoechst Corp., 34 Mass. App. Ct. 744, 751 (1993).
We begin by noting that Falaf s view of the trial judge’s findings is too narrow. While the judge did make written findings of fact in which he characterized Falat’s behavior during a telephone conversation with Patricia Frey as “unprofessional,” the judge did not find that such behavior alone caused the termination of the contract. Rather, the trial judge found, in part, that “Falat’s inability to listen to the Freys combined with unprofessional behavior during [a] telephone call caused” the contract termination. Stated alternatively, the judge found Falat to be at fault “[i]n light of’ his “repeated failures to listen to the Freys’ requests” and the “belittling of [Patricia Frey]” during the telephone call, which “effectively made any further working arrangement impossible.”
Section 7 of the parties’ agreement governing termination provided, in part:
This agreement may be terminated by either party upon seven days written notice should either party fail to perform in accordance with the terms of this Agreement through no fault of the party initiating the termination. ... In the event of termination not the fault of the Architect, the Architect shall be compensated. ...
The agreement thus allowed for termination by the Freys if Falat “fail[edj to perform in accordance” with the contract terms “through no fault of the [Freys].” If Falat performed under the agreement and the Freys still terminated his services, Falat was entitled to compensation.
The agreement required Falat to confer with the Freys up to ten times during the project, to assist them in the formation of a “program,”[5] to investigate alternative design approaches, and to help the Freys in filing documents necessary for a building permit. The record supports the trial judge’s finding that Patricia Frey had specific ideas about renovation priorities. Those priorities included both a front porch and access to the basement through a bulkhead in the rear of the house. Falat did not incorporate a front porch into the design because he believed that a porch would require a zoning variance and was, thus, impractical. Patricia Frey was informed by the building inspector, however, that a variance required for the construction of a front porch would not be difficult to obtain.[6] As to the bulkhead, the Freys wanted to retain its location to permit access to the pool located in the rear of their home. Although Falat testified that he attempted to comply with the Freys’ wishes, he wanted to move the bulkhead.
The trial judge concluded that while “[t]he Freys had a legitimate reason to be frustrated by Mr. Falat’s work on their behalf [,] Mr. Falat’s performance under the terms of the contract... met the minimum professional requirements implicit in the contract.” The Freys do not dispute this finding, which amounted to a determination that Falat did not “fail to perform in accordance with the terms” of the contract.
Therefore, the dispositive issue on this appeal is whether the Freys’ frustration with Falat’s minimum level of professional competence, his failure to incorporate the features they requested into the designs, and his unprofessional behavior dur *153 ing a telephone call with Patricia Frey permitted the trial judge’s conclusion that Falat, himself, caused the termination of the contract.
The trial judge found that after Patricia Frey spoke to the building inspector, she talked to Falat about her decisions to file for a variance to include a front porch in the renovation designs and, based on liability concerns, to request that the building permit not be issued in the Freys’ name. The judge found that Falat was “not pleased” with Patricia Frey’s action and “began yelling” at her, “called” her “naive” and stated “that the building inspector was likely looking for a bribe.”[7]
An implied covenant of good faith and fair dealing is found in every contract. Eigerman v. Putnam Invs., Inc., 66 Mass. App. Ct. 222, 226 (2006). That covenant
exists so that the objectives of the contract may be realized. The concept of good faith and fair dealing in any one context is shaped by the nature of the contractual relationship from which the implied covenant derives. The scope of the covenant is only as broad as the contract that governs the particular relationship. (Citation omitted.)
Ayash v. Dana-Farber Cancer Inst., 443 Mass. 367, 385 (2005). “[T]he purpose of the covenant is to guarantee that the parties remain faithful to the intended and agreed expectations of the parties in their performance.” Uno Restaurants, Inc. v. Boston Kenmore Realty Corp., 441 Mass. 376, 385 (2004).
The agreement in this case reflected the necessary communication component of any contract for the provision of architectural services. Obligations were placed on the Freys to provide information to Falat about their design wishes, to notify him of any nonconformity with design documents, and to furnish all “information, approvals and decisions” needed to permit the renovation work to progress in an orderly and efficient manner. The parties’ relationship of architect and homeowner could be based only upon uninhibited communication. To permit performance of the contractual obligations imposed on each party, the agreement implicitly obligated the parties to listen and respond in a respectful and productive manner so that, in the future, neither side would forego the open, honest and unrestrained communication essential to full contract performance and the successful completion of the project.
We conclude that the evidence permitted the trial judge’s finding that Falat’s conduct “effectively made any further working arrangement impossible” and that he was, thus, the cause of the termination of the parties’ agreement. We find no error.
Judgment affirmed. Appeal dismissed.
So ordered.

 The agreement provided that Falat would be paid twenty (20%) percent for schematic design, ten (10%) percent for design development, forty-five (45%) percent for construction documents, five (5%) percent for bidding and negotiation, and twenty (20%) percent for construction administration. Falat later agreed to bill the Freys at an hourly rate.

 If the agreement was terminated through no fault of Falat, he was to be compensated at twenty (20%) percent of the projected construction cost if the termination occurred during the schematic design or design development phase, ten (10%) percent if it occurred during the construction document phase, and five (5%) percent if it occurred during any subsequent phase.

 Falat claimed that $16,000.00 was the unpaid balance of his billable hours, expenses and a termination fee, minus a credit of $7,320.00 for payments received.

 Falat testified that a “program” “lists the requirements that the owner has for the design that the architect is to follow.”

 Although Patricia Frey was also informed that the Freys could incur legal liabilities as homeowners if they applied for a building permit in their own names, the trial judge found that any liability would have been transferred to Falat or a contractor when the Freys signed over the building permit.

 Patricia Frey testified that when she informed Falat of her decisions, he stated “What?’ He goes, “You know what? You were advised because that guy just wants a bribe from you. You are so naive,’ screaming at me, okay, like I was a little child.”