[Cite as *In re A.G.*, 2019-Ohio-1787.]

COURT OF APPEALS
FAIRFIELD COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| IN THE MATTER OF: A.G., I.G. E.G. and N.G. | : : : : : : : : : : : : : | JUDGES: Hon. W. Scott Gwin, P.J. Hon. Patricia A. Delaney, J. Hon. Craig R. Baldwin, J. Case Nos. 18-CA-51,18-CA-52, 18-CA-53,18-CA-54 OPINION |

CHARACTER OF PROCEEDING:      Civil appeal from the Fairfield County Court of Common Pleas, Juvenile Division, Case No. 2017AB99, 2017AB100, 2017AB101, & 2017AB181

JUDGMENT:      Affirmed

DATE OF JUDGMENT ENTRY:      May 8, 2019

APPEARANCES:

For-Appellant-Father
AMANDA R. MORRIS
5885 Wilson Road NW
Lancaster, OH 43130

For-Appellant-Mother
DAVID A. TAWNEY
117 West Main Street, Ste. 208
Lancaster, OH 43130

For State of Ohio
R. KYLE WITT
Fairfield County Prosecutor
239 West Main Street
Lancaster, OH 43130

*Gwin, P.J.*

{¶1} Appellant-father appeals the November 28, 2018 Judgment Entry of the Fairfield County Court of Common Pleas, Juvenile Court Division, which terminated his parental rights with respect to his minor children, A.G. (b. Mar. 30, 2009), I.G. (b. Nov. 08, 2013), E.G. (b. May 13, 2016, and N.G. (b. Nov. 20, 2017) and granted permanent custody of the child to appellee, Fairfield County Child Protective Services (hereinafter "FCCPS").

*Facts and Procedural History*

{¶2} At the outset, we note that Father mistakenly filed a "Notice of Cross-Appeal" in the above-captioned case. [Docket Number 7]. Rule 3 of the Ohio Rules of Appellate Procedure provides,

> (C) Cross Appeal.
>
> (1)    Cross Appeal Required.  *A person who intends to defend a judgment or order against an appeal taken by an appellant and who also seeks to change the judgment or order or, in the event the judgment or order may be reversed or modified, an interlocutory ruling merged into the judgment or order*, shall file a notice of cross appeal within the time allowed by App.R. 4.
>
> (2)    Cross Appeal and Cross-Assignment of Error Not Required. A person who intends to defend a judgment or order appealed by an appellant on a ground other than that relied on by the trial court but who does not seek to change the judgment or order is not required to file a notice of cross appeal or to raise a cross-assignment of error.

{¶3} Father is not defending the trial court's grant of permanent custody to FCCPS against the appeal taken by Mother and is not seeking to change that judgment in some other respect. Accordingly, we shall treat Father's appeal as an appeal as of right pursuant to App.R. 3(A) and (D).

{¶4} On July 21, 2017, FCCPS filed a Complaint alleging that A.G., I.G., and E.G. were dependent children. On that date, a shelter hearing was held and children were placed in the temporary shelter custody of FCCPS. On October 2, 2017, the children were found to be dependent children, and were placed in the temporary custody of FCCPS.

{¶5} On November 21, 2017, FCCPS filed a Complaint alleging that N.G. was a dependent child[1]. On that date, a shelter hearing was held, and N.G. was placed in the temporary shelter custody of FCCPS.

{¶6} On December 17, 2017, an Order of Placement in Family Drug Court was filed with respect to both mother and Appellant.

{¶7} On February 2, 2018, N.G. was found to be a dependent minor, and was placed in the temporary custody of FCCPS.

{¶8} On April 17, 2018, a review hearing was held with respect to the children.

{¶9} On May 17, 2018, FCCPS filed a Motion for Permanent Custody with respect to all four children.

{¶10} On July 10, 2018, a review hearing was held with respect to all four children. This hearing was an annual review for A.G., I.G. and E.G. and the temporary custody of the children was extended for six months.

---

[1] N.G. was removed from mother's care at the time of her birth.

{¶11} On September 20, 2018, a pre-trial was held on the Motion for Permanent Custody.

{¶12} On October 4, 2018, an evidentiary hearing on the Motion for Permanent Custody was held.

*PERMANENT CUSTODY TRIAL*

{¶13} The initial concerns for Father at the time of the initial involvement of FCCPS included concerns with stable housing and income, as Father was unemployed and did not have independent housing; concerns over Father's ability to provide appropriate and adequate supervision while utilizing appropriate parenting techniques; concerns over Father's history of substance abuse. Additionally, most or all of these concerns continued to exist at the time N.G. was born and FCCPS became involved with her, as N.G. was born with concerns over withdrawal symptoms, and there were concerns over Father's behavior at the hospital[2].

{¶14} FCCPS requested that Father engage in treatment to address mental health and substance abuse issues; demonstrate sobriety during the life of the case; attend visits with the children and demonstrate appropriate parenting techniques during those visits; engage in parenting education services to remedy any concerns over his parenting abilities; maintain stable housing and stable income during the life of the case, Additionally, after a referral from FCCPS, Father was accepted into the Fairfield County Family Drug Court.

{¶15} FCCPS asked Father to engage in treatment for mental health and substance abuse issues.

---

[2] Testimony indicated that N.G. was suffering from marijuana withdrawal symptoms. (T. at 157-158).

{¶16} Father acknowledged during testimony that he had been dealing with substance abuse issues for nearly ten years, and his use included Xanax and methamphetamines. Additionally, there was testimony to suggest that Father may have mental health issues.

{¶17} At one point, Father testified that he previously used methamphetamines to help him multi-task. During the life of the case, Father was inconsistent with his treatment. At one point, Father was working with the Recovery Center to seek treatment for these issues. However, at some point, Father stopped engaging with the Recovery Center after being assigned a counselor that he indicated he did not trust. At the time of the hearing, Father acknowledged that he had not been actively engaged in counseling with the Recovery Center or another provider for several months. Father had an active referral for Ohio Guidstone at the time of the hearing, but he had not yet been formally assessed, due in part to his failure to follow-up on the referral.

{¶18} Father indicated that he was receiving some services through One Step Recovery. However, testimony reflected that Father was primarily utilizing this organization to receive his Suboxone, and that FCCPS had made Father aware that the low level of counseling he was receiving with this organization was not sufficient to meet the goal of his case plan. There was testimony during the hearing that at one point around April 2018, it was recommended that Father attend inpatient treatment to address his substance abuse problem. Father declined to do so as recommended. There was some testimony regarding approximately eleven days of a rehabilitation program that Father may have participated in, but it did not appear that Father had successfully completed that program. Father admitted to relapsing since that time.

{¶19} Given Father's significant history with substance abuse, and the relapses he had during the life of this case, Father's inconsistent, limited engagement in substance abuse counseling was insufficient to remedy the concerns of FCCPS.

{¶20} FCCPS asked Father to screen for alcohol and drugs and demonstrate ongoing sobriety.

{¶21} For the most part, the testimony regarding this aspect of Father's case plan was not disputed during the hearing. All parties agreed to the admission of an Exhibit detailing Father's records with respect to calling and screening with American Court Services.

{¶22} From the time that the oldest three children were removed from the home in July 2017, until approximately April 2018, Father was inconsistent with this aspect of his case plan. There were times when Father failed to call and screen. Father also admitted to multiple relapses, including one as recently as April 2018.

{¶23} To Father's credit, there was testimony to suggest that since April 2018, he has been compliant with this aspect of his case plan. He has called and screened as requested for FCCPS or his probation officer, and has provided screens that did not contain any unauthorized substances.

{¶24} Although there has been some improvement with respect to this aspect of Father's case plan, given the multiple relapses, along with Father's failure to consistently engage in appropriate treatment, concerns remain over Father's ability to remain clean and sober over an extended period.

{¶25} FCCPS asked Father to attend regular visitation sessions with the children and demonstrate appropriate parenting techniques and adequate supervision during those visits.

{¶26} Father was provided the opportunity to regularly visit with the children. Due to ongoing concerns throughout the case, those visits remained supervised during the entire period since the children were removed from the home.

{¶27} With respect to his attendance at scheduled visits, testimony reflected that Father consistently attended his visits with the children. There was some testimony to suggest that Mother attended visits alone during periods when Father could not attend during incarceration, but for the most part, Father attended visits when he was able.

{¶28} With respect to Father's behavior during visits, there was significant testimony regarding concerns over the appropriateness of Father's behavior, along with his ability to adequately supervise the children. There was testimony to suggest that Father would often ridicule Mother during visits, and would call her inappropriate names during visits.

{¶29} There was testimony indicating that the visitation monitor assigned to the case would often have to step in to correct Father, either due to a safety concern, or because one or more of the children were becoming upset. Multiple people testified that Father would engage in inappropriate conversations with A.G. during visits, and would often make her upset. For example, Father was witnessed discussing his recent jail time with A.G. during a visit. Additionally, Father was overheard explaining to A.G. that he was able to obtain food without paying for it, which upset his daughter. On another visit, A.G. was excited about her new shoes, and Father intentionally stepped

on them, upsetting his daughter. Finally, on another occasion, Father was witnessed telling one of the younger children that he could urinate in his pants, as opposed to taking him to the restroom. A.G. witnessed this and became upset.

{¶30} Multiple witnesses testified that Father's rough play would upset the children, and that Father would not always stop the rough play at the request of the children. Instead, the visitation monitor would have to step in and ask Father to stop as one or more of the children were becoming upset.

{¶31} On one visit, Father was witnessed providing one of the children with an unopened drink that he had found on the ground.

{¶32} There was also testimony to suggest that Father, along with Mother, had difficulty supervising all of the children during visits. At times, I.G. and E.G. would receive very little attention during a visit, and may not have been appropriately supervised.

{¶33} In recent months, visits with the children were separated so that visits with the older two children would occur on one day, and visits with the younger two children on another. This was done as part of a therapeutic recommendation, and in an attempt to help the parents provide adequate attention to each of the children. There was testimony to suggest that visits were often ended early at the request of Father.

{¶34} FCCPS often asked Father, along with Mother, to provide the children with a meal or snacks during visitation. On most occasions, the parents failed to do so. On one occasion, Father indicated that he did not have money to buy the children a meal, but later in the same visit, purchased a meal for himself and Mother.

{¶35} Testimony reflected that at some point during the course of the case, Father was offered parenting education services by FCCPS. Father chose not to engage in these services.

{¶36} FCCPS asked Father to maintain stable income and housing in order to address concerns over his ability, along with Mother's, to provide a stable home and other necessities for the children. At some point on or around the Agency's initial involvement, Father, Mother, and the children were residing with Mother's mother. There were approximately nine people, including the children, staying in the three bedroom home. There was testimony to suggest that Mother, Father, and the children were evicted from that home around July 2017. At some point after that time, Father, Mother, and the children began to reside with Father's father. There was testimony to suggest that there were many people residing in that four bedroom home. Father indicated that the family spent two or three months in the home, and left the home at some point in 2017.

{¶37} Father did not have stable housing suitable for the children at any point during the life of the case. Father indicated that at various times during the case he was homeless, staying in shelters, incarcerated, or sleeping from couch to couch. At the time of the hearing, nearly fifteen months after the oldest children were removed, Father and Mother were staying with a friend in a one-bedroom apartment. Father acknowledged that the children would not be able to live in that housing.

{¶38} There was testimony to suggest that Father and Mother had contacted someone about an apartment that might become available in the weeks after the hearing. However, there was no guarantee that the apartment would be available, and

there was testimony to suggest that neither Mother nor Father had the ability to pay the necessary deposit for housing. Father also testified that he has a history of evictions that have made obtaining housing difficult.

{¶39} There was some testimony to suggest that there were times that Father made small amounts of income doing odd jobs or mowing lawns. There was no indication that this income was steady or significant. At one point during 2018, Father obtained employment with a factory. Father testified that he worked at this factory for approximately two months before being terminated. At the time of the hearing, Father was unemployed, and had been for multiple months.

{¶40} Father testified that although he had access to a vehicle, it was currently impounded, and he was unable to pay to have it returned. Additionally, he did not have an operator's license at the time of the hearing.

{¶41} At some point late in 2017, Father entered the Family Court program with the Court. While testimony indicated that this is a voluntary program, some testimony also suggested that Father was ordered to participate in this program through his Municipal Court cases.

{¶42} For the most part, testimony indicated that Father was a regular attendee at Family Court, and engaged in many of the services necessary for the program. However, Father never moved on past Phase I of the program, in part due to relapses with substance abuse, a failure to get an appropriate sponsor, and inconsistencies with respect to other aspects of the program. Testimony indicated that a fully engaged, successful participant in the program would have been able to move through the phases much more quickly than Father was able to do.

{¶43} Father has a significant history of incarceration, including during multiple times after the children were removed.   For example, in September and October 2017, Father served approximately thirty-seven days in jail.  In January and February 2018, Father served approximately forty-one days in jail.  In April and May of 2018, Father served approximately forty-five days in jail.  As recently as August 2018, Father served three days in jail.  At the time of the hearing, Father indicated that he has multiple pending charges, and a significant amount of jail time that may be imposed.

{¶44} On October 9, 2018, the magistrate issued its findings of fact granting permanent custody of the children to FCCPS and terminating Father's parental rights. Specifically, the magistrate court found that the children could not and should not be placed with Father at this time, and permanent custody was in the children's best interest.

{¶45} By Judgment Entry filed November 28, 2018, the trial court overruled the Objections, independently reviewed the evidence and issued Findings of Fact and Conclusions of Law granting permanent custody of the children to FCCPS and terminating Father's parental rights.  Specifically, the trial court found that the children could not and should not be placed with Father at this time, and permanent custody was in the children's best interest.

*Assignments of Error*

{¶46} Appellant raises three assignments of error,

{¶47} "I THE TRIAL COURT ERRED BY DENYING FATHER AN EXTENSION OF TEMPORARY CUSTODY.

{¶48} "II. THE TRIAL COURT ERRED BY FINDING THAT THE CHILDREN COULD NOT HAVE BEEN PLACED WITH FATHER WITHIN A REASONABLE AMOUNT OF TIME.

{¶49} "III. THE TRIAL COURT ERRED BY FINDING THAT PERMANENT CUSTODY WAS IN THE CHILDREN'S BEST INTEREST."

I., II, and III.

{¶50} Father asserts that the trial court should have allowed him further opportunity to work toward reunification because he had approximately fourteen more months before reaching the sunset date of two years.   In his Second and Third Assignments of Error, Father asserts that the trial court's decision is against the sufficiency and weight of the evidence.

**Burden of Proof**

{¶51} "[T]he right to raise a child is an 'essential' and 'basic' civil right."  *In re Murray,* 52 Ohio St.3d 155, 157, 556 N.E.2d 1169(1990), quoting *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551(1972).  A parent's interest in the care, custody and management of his or her child is "fundamental."  Id.; *Santosky v. Kramer*, 455 U.S. 745, 753, 102 S.Ct. 1388, 71 L.Ed.2d 599(1982).  The permanent termination of a parent's rights has been described as, "* * * the family law equivalent to the death penalty in a criminal case."  *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45(6th Dist. 1991).  Therefore, parents "must be afforded every procedural and substantive protection the law allows."  Id.

{¶52} An award of permanent custody must be based upon clear and convincing evidence.  R.C. 2151.414(B)(1).  The Ohio Supreme Court has defined "clear and

convincing evidence" as "[t]he measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established. It is intermediate, being more than a mere preponderance, but not to the extent of such certainty as required beyond a reasonable doubt as in criminal cases. It does not mean clear and unequivocal." *In re Estate of Haynes*, 25 Ohio St.3d 101, 103-104, 495 N.E.2d 23 (1986).

### *Standard of Review*

**{¶53}** The Ohio Supreme Court has delineated our standard of review as follows,

> Where the degree of proof required to sustain an issue must be clear and convincing, a reviewing court will examine the record to determine whether the trier of facts had sufficient evidence before it to satisfy the requisite degree of proof. See *Ford v. Osborne*, 45 Ohio St. 1, 12 N.E. 526, *Cole v. McClure*, 88 Ohio St. 1, 102 N.E. 264, and *Frate v. Rimenik,* 115 Ohio St. 11, 152 N.E. 14.

*Cross v. Ledford,* 161 Ohio St. 469, 477, 120 N.E. 2d 118 (1954). A court of appeals will affirm the trial court's findings "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re Adkins,* 5th Dist. Nos. 2005AP06–0044 and 2005AP07–0049, 2006-Ohio-431, 2006 WL 242557, ¶17.

**{¶54}** In *Cross*, the Supreme Court further cautioned,

The mere number of witnesses, who may support a claim of one or the other of the parties to an action, is not to be taken as a basis for resolving disputed facts. The degree of proof required is determined by the impression which the testimony of the witnesses makes upon the trier of facts, and the character of the testimony itself. Credibility, intelligence, freedom from bias or prejudice, opportunity to be informed, the disposition to tell the truth or otherwise, and the probability or improbability of the statements made, are all tests of testimonial value. *Where the evidence is in conflict, the trier of facts may determine what should be accepted as the truth and what should be rejected as false.* See *Rice v. City of Cleveland*, 114 Ohio St. 299, 58 N.E.2d 768.

161 Ohio St. at 477-478. (Emphasis added).

### *Requirements for Permanent Custody Awards*

**{¶55}** R.C. 2151.414 sets forth the guidelines a trial court must follow when deciding a motion for permanent custody. R.C. 2151.414(A)(1) mandates the trial court schedule a hearing and provide notice upon filing of a motion for permanent custody of a child by a public children services agency or private child placing agency that has temporary custody of the child or has placed the child in long-term foster care.

**{¶56}** Following the hearing, R.C. 2151.414(B) authorizes the juvenile court to grant permanent custody of the child to the public or private agency if the court determines, by clear and convincing evidence, it is in the best interest of the child to grant permanent custody to the agency, and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents;

(b) the child is abandoned;

(c) the child is orphaned and there are no relatives of the child who are able to take permanent custody; or

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

{¶57} Therefore, R.C. 2151.414(B) establishes a two-pronged analysis the trial court must apply when ruling on a motion for permanent custody. In practice, the trial court will usually determine whether one of the four circumstances delineated in R.C. 2151.414(B)(1)(a) through (d) is present before proceeding to a determination regarding the best interest of the child.

1**. Parental Placement within a Reasonable Time–R.C. 2151.414(B)(1)(a).**

{¶58} The court must consider all relevant evidence before determining the child cannot be placed with either parent within a reasonable time or should not be placed with the parents. R.C. 2151 .414(E). The statute also indicates that if the court makes a finding under R.C. 2151.414(E)(1)—(15), the court shall determine the children cannot or should not be placed with the parent. A trial court may base its decision that a child cannot be placed with a parent within a reasonable time or should not be placed with a parent upon the existence of any one of the R.C. 2151.414(E) factors. The existence of one factor alone will support a finding that the child cannot be placed with the parent within a reasonable time. *See In re William S.*, 75 Ohio St.3d 95, 1996–Ohio–182, 661 N.E.2d 738; *In re Hurlow*, 4th Dist. Gallia No. 98 CA 6, 1997 WL 701328 (Sept. 21, 1998); *In re Butcher*, 4th Dist. Athens No. 1470, 1991 WL 62145(Apr. 10, 1991).

{¶59} R.C. 2151.414(E) sets forth factors a trial court is to consider in determining whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents. Specifically, Section (E) provides, in pertinent part, as follows:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the

Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for changing parental conduct to allow them to resume and maintain parental duties.

* * *

(16) Any other factor the court considers relevant.

{¶60} R.C. 2151.414(D) requires the trial court to consider all relevant factors in determining whether the child's best interests would be served by granting the permanent custody motion. These factors include but are not limited to: (1) the interrelationship of the child with others; (2) the wishes of the child; (3) the custodial history of the child; (4) the child's need for a legally secure placement and whether such a placement can be achieved without permanent custody; and (5) whether any of the factors in divisions (E)(7) to (11) apply.

{¶61} In this case, the trial court made its permanent custody findings pursuant to R.C. 2151.414(E)(1), (4) and /or (13) and /or (16).

{¶62} As set forth above, the trial court's findings are based upon competent credible evidence. The record includes the recommendation of the guardian ad litem for the children, and the testimony of the witnesses at trial. The trial court was in the best position to determine the credibility of the witnesses.

{¶63} The court found that Father failed to consistently engage in treatment to address mental health and substance abuse issues. Although Father had demonstrated several months of sobriety in the time leading up to the hearing, he failed to consistently demonstrate sobriety throughout the life of the case. Although Father regularly attended visitation sessions with the children, he failed to consistently utilize safe and appropriate parenting techniques during visits, and struggled to manage the demands of all of the children. Father failed to engage in parenting education services, even though he was given the opportunity to do so.

{¶64} The court further noted that Father failed to maintain stable income and housing during the duration of the case. Aside from a two-month period, he was

unemployed during the duration of the case. At no point during the case did Father maintain stable housing that would be appropriate for the children.

**{¶65}** The court also noted that Father participated in the Family Court program, but for a variety of reasons, was unable to complete even Phase I of the program. Father was incarcerated at various times throughout the duration of the case, and this incarceration led to inconsistencies in his case plan services. Father acknowledged at the time of the hearing that he was not in a position to have the children at this time, but asked for more time to engage in services.

**{¶66}** The court concluded that despite reasonable case planning and diligent efforts by FCCPS, Father has failed continuously and repeatedly to substantially remedy the conditions causing the children to be placed outside of the home.

**{¶67}** The evidence demonstrated the successful efforts Father had made on the case plan. On that point, the evidence demonstrates that any improvement that Father has made in his life is tentative and, perhaps, temporary, and that he is at risk of relapse. The trial court found that, regardless of Father's compliance with aspects of his case plan, he was still not able to be a successful parent to these children.

**{¶68}** In the case of *In re: Summerfield*, 5th Dist. Stark No. 2005CA00139, 2005-Ohio-5523, this court found where, despite marginal compliance with some aspects of the case plan, the exact problems that led to the initial removal remained in existence, a court does not err in finding the child cannot be placed with the parent within a reasonable time.

**{¶69}** Based upon the foregoing, as well as the entire record in this case, the Court properly found the children could not or should not be returned to Father within a

reasonable time. Despite offering numerous services, Father was unable to mitigate the concerns that led to the children's removal.

### The Best Interest of the Child

**{¶70}** In determining the best interest of the child at a permanent custody hearing, R.C. 2151.414(D) mandates the trial court must consider all relevant factors, including, but not limited to, the following: (1) the interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child; (2) the wishes of the child as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child; (3) the custodial history of the child; and (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody.

**{¶71}** The focus of the "best interest" determination is upon the child, not the parent, as R.C. 2151.414(C) specifically prohibits the court from considering the effect a grant of permanent custody would have upon the parents. *In re: Awkal*, 95 Ohio App.3d 309, 315, 642 N.E.2d 424(8th Dist.1994). A finding that it is in the best interest of a child to terminate the parental rights of one parent is not dependent upon the court making a similar finding with respect to the other parent. The trial court would necessarily make a separate determination concerning the best interest of the child with respect to the rights of the mother and the rights of the father.

**{¶72}** The trial court made findings of fact regarding the children's best interest. It is well-established that "[t]he discretion which the juvenile court enjoys in determining whether an order of permanent custody is in the best interest of a child should be

accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *In re: Mauzy Children*, 5th Dist. Stark No. 2000CA00244, 2000 WL 1700073(Nov. 13, 2000), *quoting In re Awkal*, 95 Ohio App.3d 309, 316, 642 N.E.2d 424(8th Dist. 1994).

**{¶73}** As an appellate court, we neither weigh the evidence nor judge the credibility of witnesses. Our role is to determine whether there is relevant, competent and credible evidence, upon which the fact finder could base its judgment. *Cross Truck v. Jeffries,* 5th Dist. Stark No. CA-5758, 1981 WL 6321(Feb. 10, 1982). "Reviewing courts should accord deference to the trial court's decision because the trial court has had the opportunity to observe the witnesses' demeanor, gestures, and voice inflections that cannot be conveyed to us through the written record, *Miller v. Miller*, 37 Ohio St. 3d 71, 523 N.E.2d 846(1988).

**{¶74}** In the present case, the trial court's decision indicates it considered the best interest factors. Upon review of the record, it is clear that the record supports the trial court's finding that granting the motion for permanent custody is in the children's best interest. The trial court concluded the children's need for legally secure placement could not be achieved without awarding permanent custody to FCCPS.

**{¶75}** There was consistent testimony to suggest that Father and Mother love the children. There was also some evidence to suggest that the children love Father and Mother.

**{¶76}** Aside from a short period of employment, Father did not maintain regular income for the children. There was no evidence to suggest that Father's failure to gain employment or provide income was for a legitimate reason. Father failed to take steps

to acquire stable, appropriate housing for the children.  At the time of the hearing, nearly fifteen months after the oldest children were removed, Father was residing in an apartment that was not suitable for the children.  Father failed to provide food and snacks for the children on many occasions during visits, despite being asked to do so. On one occasion, testimony suggested that Father indicated that he did not have money to provide a meal for the children, but later in the same visit, was witnessed purchasing a meal for him and Mother.  Visits with the children often ended early at the request of Father.  Neither parent has had unsupervised contact with the children since they were removed from the home.

{¶77} Father has been repeatedly incarcerated, including on several occasions since the children were removed from the home.  Father cannot care for the children during times of incarceration.  At the time of the hearing, Father had additional pending criminal charges, and significant periods of jail time that could be imposed later.

{¶78} Father acknowledged during testimony that there has been some history of domestic violence between he and Mother.  Although it was unclear when this domestic violence occurred, and whether it continues, there are some significant concerns regarding the relationship between Father and Mother.  Father was witnessed calling Mother names during visits and in front of the children.  There was other testimony to suggest that Mother was more appropriate and successful during visits when Father was not present.  Additionally, Mother lost her housing that would have been appropriate for the children because of issues related to allowing Father on the premises.

{¶79} A.G. often became upset around Father. There was consistent testimony suggesting that Father would engage in inappropriate conversations around A.G. and that A.G. would often become upset. There was also some testimony to suggest that I.G. and E.G. were often left with little supervision during visits, and did not receive the full attention of Father and Mother.

{¶80} With respect to A.G. the court found that FCCPS has made reasonable efforts to prevent the need for placement, to include but not be limited to referrals to mental health treatment, facilitation of tutoring and extra-curricular activities, foster care placement, regular visitation with Father and Mother, and by providing services to Father and Mother.

{¶81} With respect to I.G. the court found that FCCPS has made reasonable efforts to prevent the need for placement, to include but not be limited to the following: facilitation of pre-school and a referral to the Head Start program, foster placement, regular visitation with Father and Mother, and by providing services to Father and Mother.

{¶82} With respect to E.G. the court found that FCCPS has made reasonable efforts to prevent the need for placement, to include but not be limited to referrals to Children's Hospital for medical and mental health issues, a referral for a speech assessment, a referral to the Early Head Start program, foster placement, regular visitation with Father and Mother, and by providing services to Father and Mother.

{¶83} With respect to N.G., the court found that FCCPS has made reasonable efforts to prevent the need for placement, to include but not be limited to a referral to the

Help Me Grow program, foster placement, regular visitation with Father and Mother, and by providing services to Father and Mother.

{¶84} The court further found A.G. has been in her current placement since approximately August 1, 2018. By all accounts, she is doing well in this placement. She has been witnessed hugging and laughing with her current foster family, and has suggested that she wants to stay in her current placement. She is very bonded with her current placement providers. I.G. is currently placed in the same home as A.G. and N.G. and has been there since approximately August 1, 2018. By all accounts, he is doing well in his current placement. He has been witnessed reading books with his foster family, and being very engaged with the family. He is very bonded with his current placement providers. N.G.is currently placed in the same home as A.G. and I.G. and has been there since August 1, 2018. N.G. has been witnessed to be laughing, and very comfortable in the arms of her current placement providers.

{¶85} At this time, E.G. is in a separate placement from his siblings. For some period, E.G. has demonstrated some challenging behaviors, including banging his head into things, and going through long periods of screaming and crying. E.G. was separated from his siblings in an attempt to provide him with the necessary attention to address concerns with him. E.G. has been residing with his current providers since approximately the second week of August 2018. Since that time, E.G.'s behavioral issues have begun to subside, particularly in the month leading up to the hearing. E.G. has been witnessed going to his foster family for comfort, and has been seen happy and playing with others in the home.

{¶86} A.G. and I.G., through their respective attorney's indicated that they supported the Motion for Permanent Custody, and wished to stay with her current providers. E.G. and N.G. are too young to express their wishes. The Guardian ad Litem indicated at the hearing that she supported the Motion for Permanent Custody and indicated that she believed it was in the best interest of all of the children.

{¶87} The record does not demonstrate that if Father had been offered different case plan services, or additional time to complete services the result would have been different. This Court has observed,

> The unfitness of a parent, guardian or custodian can be predicted by past history.
>
> " * * * [A] child should not have to endure the inevitable to its great detriment and harm in order to give the * * * [parent, guardian, or custodian] an opportunity to prove her suitability. To anticipate the future, however, is at most, a difficult basis for a judicial determination. The child's present condition and environment is the subject for decision not the expected or anticipated behavior of unsuitability or unfitness of the * * * [parent, guardian, or custodian]. * * * The law does not require the court to experiment with the child's welfare to see if he will suffer great detriment or harm." *In re East, supra*, 32 Ohio Misc., at 69, 61 O.O.2d at 41, 288 N.E.2d at 346. *See, also, In re Custody of Minor* (1979), 377 Mass. 876, 882–883, 389 N.E.2d 68, 73 (court need not wait until presented with maltreated child before it decides the necessity of "care and protection"); In re Interest of J.A.J. (Mo.App.1983), 652 S.W.2d 745, 749 (to wait until

child suffers harm to terminate parental rights would be "a tragic misapplication of the law"); *New Jersey Div. of Youth & Family Services v. A.W.* (1986), 103 N.J. 591, 616, 512 A.2d 438, 451, at fn. 14 (to wait until injury to decide issue of health and development of child makes no sense).

It is not necessary that the Varners or Booths be given the opportunity to prove that they can properly care for Crystal.

*In re Bishop* (1987), 36 Ohio App.3d 123, 126, 521 N.E.2d 838(1987).

**{¶88}**  For these reasons, we find that the trial court's determination that Father had failed to remedy the issues that caused the initial removal and therefore the children could not be placed with him within a reasonable time or should not be placed with her was based upon competent credible evidence and is not against the manifest weight or sufficiency of the evidence.  We further find that the trial court's decision that permanent custody to FCCPS was in the children's best interest was based upon competent, credible evidence and is not against the manifest weight or sufficiency of the evidence.

{¶89} Because the evidence in the record supports the trial court's judgment, we overrule Father's First, Second and Third Assignments of Error, and affirm the decision of the Fairfield County Court of Common Pleas, Juvenile Division.

By Gwin, P.J.,

Delaney, J., and

Baldwin, J., concur

WSG:clw 0424